707 A.2d 866

**FRIENDS OF THE RIDGE, et al.**

**v.**

**BALTIMORE GAS AND ELECTRIC COMPANY.**

**No. 309, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

April 1, 1998.

446

J. Carroll Holzer (Holzer and Lee, on the brief), Towson, for appellants.

John H. Zink, III (Patricia A. Malone, Kathleen Cox, C. Carey Deeley, Jr. and Venable, Baetjer & Howard, L.L.P., on the brief), Towson, for appellee.

Argued before HARRELL, J., and THEODORE G. BLOOM and PAUL E. ALPERT, Judges (retired), Specially Assigned.

HARRELL, Judge.

"Power to the People" [1]

Baltimore Gas And Electric Company (BGE), appellee and cross-appellant, seeking to replace and expand an existing electrical transformer substation (the Ivy Hill substation) located on the south side of Ridge Road, at its intersection with Gent Road, in northern Baltimore County, filed with the Zoning Commissioner of Baltimore County (Zoning Commis-

---

[1] Although normally associated with The Black Panther Party For Self–Defense (1966), this slogan, transposed here, speaks differently on at least two levels to nuances of the instant case.

sioner) a petition for special exception, joined with a petition for a variance of internal lot line setback requirements, to accomplish that objective. After public hearings, the Zoning Commissioner, and thereafter the Baltimore County Board of Appeals (Board), granted BGE's petitions for both the special exception and variance over the vigorous opposition of appellants and cross-appellees, and other neighbors or organizations of neighbors in the vicinity of the BGE property (we will most often hereafter refer to appellants/cross-appellees as "the neighbors").

Appellants/cross-appellees appealed the grant of the petitions to the Circuit Court for Baltimore County. In the preliminary skirmishing, BGE moved to dismiss the appeal as to the variance, contending the neighbors lacked standing. The circuit court (Daniels, J.) ultimately denied the motion to dismiss and affirmed the Board's grant of both the special exception and the variance.

Appellants filed a timely appeal to this Court regarding the circuit court's affirmance of the Board's decision. BGE cross-appealed the circuit court's denial of its motion to dismiss the neighbors' appeal as to the variance.

## *ISSUES*

Because its resolution may affect the contours of our discussion of the neighbors' issues, we shall first consider BGE's cross-appeal contention, which is, as slightly rephrased by us:

I. As appellants/cross-appellees were not aggrieved parties as to the variance request, the circuit court erred in not dismissing their appeal of its approval for lack of standing.

Depending on our disposition of the foregoing proposition, we may proceed to consider the following appellate questions propounded by the neighbors, which we also have slightly rephrased as:

II. Did the Board err, as a matter of law under the Baltimore County Zoning Regulations (BCZR), in concluding that BGE's proposed replacement and enlargement of the Ivy Hill substation, at least as it implicated that part of

the BGE property described as Tract "A," did not also require an amendment to the Final Development Plan for the Fox Ridge Estates community?

III. Did the Board err, as a matter of law, in granting the variance?

IV. Did the Board err, as a matter of law under the BCZR, in finding that there was a need for the augmented electric substation?

V. Did the circuit court err in denying appellants' Motion to Alter or Amend Judgment which was based upon new evidence as to the alleged deleterious effect on the neighbors' property values due to BGE's land use proposal?

## THE FACTS

In March 1956, the Zoning Commissioner approved BGE's petition for a special exception to erect and operate a 16.6 megawatt, single transformer electrical substation [2] occupying approximately 1200 square feet of the surface of a trapezoid-shaped, 0.40 acre parcel (Tract C) owned by BGE, abutting the south side of Ridge Road, opposite its intersection with Gent Road, and approximately 625 feet west of Falls Road, in Baltimore County. Upon its construction and placement into service later in 1956, this transformer was known as the Ivy Hill substation. The initial service area of the Ivy Hill substation was established as an 18 square mile portion of northern Baltimore County roughly bounded by Butler Road on the north, Sagamore Forest Road on the west, Broadway Road and Caves Road on the south, and Oregon Ridge Park on the east.[3]

---

**2.** The purpose of such a local electric distribution substation is to receive higher voltage electricity from a master substation and to lower (transform) that electricity to a usable level for customers in the local service area.

**3.** The service area of a substation is not necessarily a static concept. As later developing facts reveal, the provision of electrical service to a local area, in whole or in part, can be shifted, within some constraints, to a more remote source substation. Whether this shift is permanent or temporary apparently depends on a complex and ever-changing set of

Anticipating that the 16.6 megawatt facility some day would become obsolete due to, among other reasons, increased demand for electricity, BGE appears to have begun laying the foundation for an expansion of the Ivy Hill substation no later than 1988 when it contracted to acquire a 1.5 acre parcel (Tract A) abutting Tract C on its eastern and southern boundaries. BGE acquired Tract C in 1989 from Mr. George V. Palmer, the principal owner-developer of the abutting property, who, in 1988, had obtained approval of a Final Development Plan for the entirety of his property, referred to then as the Forwood Property (later to be known as the Fox Ridge Estates development).[4] On the approved 1988 Final Development Plan (the Plan), the heavily-wooded Tract A, unlike the other proposed parcels shown on the Plan, was not assigned any specific development proposal or information; instead, arrows drew attention to the fact that Tract A was labeled as to be "conveyed to adjoining property owner BGE Co." The Plan also indicated that BGE owned the abutting Tract C. The Plan depicted the remaining property as lots for 24 single-family-detached, residential dwellings, and showed such development information for each proposed lot as house location, building envelope, septic field location, and subdivision street pattern. Thus, at the time of conveyance of Tract A to BGE in 1989, the 16.6 megawatt Ivy Hill substation on Tract C was in existence and operating, but none of the proposed residential building lots on the Forwood/Fox Ridge

---

variables that include tracking geographical growth in demand for electricity over time and forecasting future growth trends (relying on industry computer models into which are "cranked" governmentally-generated development data), which result in capital project planning designed to remedy existing service problems as well as to stay ahead of identifiable future needs. These same variables also dictate the extent and timing of additions to the overall electric grid. Emergency electrical needs also receive attention in this formulation.

4. The Forwood Property was zoned R.C. (rural residential). Under the BCZR, before R.C. property could be developed, a final development plan, among other things, had to be approved by the Zoning Commissioner.

Estates property had been developed or sold to anyone, let alone appellants/cross-appellees here.

Rounding out its land assemblage for the planned expansion of the Ivy Hill substation, BGE contracted in 1994, prior to filing the instant petitions, with a Mr. & Mrs. Vinup to acquire their 0.922 acre tract abutting Tract C on the west. The Vinups' property, referred to as Tract B, was improved at the time by a residence and a swimming pool, both of which BGE planned to raze in order to make the property suitable for the planned substation expansion.

Over the period from 1989 until BGE contracted with the Vinups in 1994, and while BGE apparently was engaged in its internal planning efforts with regard to the Ivy Hill substation, the Forwood Property/Fox Ridge Estates lots were developed, and homes were built on them and sold by Mr. Palmer's successor, JCS Corporation.[5] The owners of those

---

5. Of the appellants, only Mr. and Mrs. Ronald Hanley and Mr. and Mrs. Robert O'Hara clearly appear to be residents of a nearby neighborhood other than the Forwood Property/Fox Ridge Estates subdivision. The Hanleys live at 19820 Ridge Road, directly north of the assembled BGE property and across from the driveway to the proposed substation (the Hanleys have lived there since 1979). The O'Haras live on property at a corner of the intersection of Ridge Road and Falls Road, although we were unable to discern a more precise address or location from our perusal of the joint record extract. We likewise were unable to determine how long the O'Haras have resided at that location. Of the other appellants, we were unable to identify precisely where Mr. and Mrs. Jeffrey Bozel resided (although they appear to be residents of Fox Ridge Estates) or where Mr. and Mrs. Bruce Pitcher resided. Of appellants who clearly were identified as residents of Fox Ridge Estates, all had addresses on Joel Court, a 24 foot wide, paved residential subdivision street separating the southerly boundary of the augmented BGE property (i.e., across the street from Tract A) from the homes in Fox Ridge Estates. Mr. and Mrs. Carl Follo have lived at 1 Joel Court since approximately June 1992. They testified before the Board that they lived within 300 feet of the subject property of BGE's proposal. Their address was also that of the "Friends of The Ridge," an unincorporated association of neighbors in the area banned together apparently in response to BGE's proposal. Mr. and Mrs. Robert Rytter have resided at 3 Joel Court since approximately June 1992 also. Mr. and Mrs. Nigel Howse moved to 4 Joel Court in June 1994 (they also testified that their property was within 300 feet of the BGE property). Mr. and Mrs. Ira Brown reside at 5 Joel Court. Mr. and Mrs. Joseph Czajkow-

homes, together with a few other neighbors in the surrounding area, understandably became the moving forces opposing BGE's expansion plans.[6] The neighbors residing in Fox Ridge Estates claimed that, at the time they purchased their homes, they had no idea that BGE might expand the Ivy Hill substation beyond Tract C. This belief was fostered either by representations made to them by the builder/developer (or its representatives) prior to or at the time of their closings or by opinions they formed from their scrutiny of some or all of the available public documents regarding the development planned for the Forwood Property, i.e., approved subdivision plat and/or the Plan. Even those who carefully perused the Plan concluded that Tract A could not be developed without an amendment to the Plan because the Plan did not propose any specific development on Tract A.[7]

---

ski moved to 6 Joel Court in December 1993. Mr. and Mrs. Dieter Langendorf reside at 7 Joel Court (and have since May 1993) and Mr. and Mrs. Andrew Lansman live at 9 Joel Court (since approximately June 1992).

6. We do not mean to appear to minimize the number or depth of the expressed opposition to BGE's proposals marshaled before the Board. There were many additional individual homeowners, community associations, and elected public officials who testified or communicated in writing their opposition and/or concerns regarding the petitions. For whatever reasons, however, only the persons referred to in n. 4, *supra,* sought judicial review.

7. The purposes for requiring approval of a Final Development Plan are two-fold: "(a) to provide for the disclosure of development plans to prospective residents and to protect those who have made decisions based on such plans from inappropriate changes therein; and (b) to provide for review of residential development plans to determine whether they comply with these regulations and with [adopted] standards and policies ..." BCZR § 1B01.3.A.1. In furtherance of these purposes, the BCZR also provides, *inter alia,* that copies of any approved Plan shall be appended to a buyer's instrument of sale (together with notice of the provisions of the County Code and BCZR governing the Plan and the amendment process), § 1B01.3.A.4, and that the proposed Plan must show proposed structures, existing topography and major vegetation, and proposed grading, among other things. § 1B01.3.A.5.b. The BCZR, at § 1B01.3.A.7, provides for different amendatory processes for approved Plans under two scenarios, one where the amendment is sought prior to the sale of an interest in nearby property and the other after such a sale or upon demand for

On 10 May 1994, BGE filed with the Zoning Commissioner a petition for special exception for "an outdoor electric public utility service center (electric substation) in an R.C.–5 Zone [as allowed by special exception in BCZR § 1.A.0.4.2.B.11] and to amend the Fox Ridge Estates (formerly Forwood Property) Final Development Plan if necessary." In addition, BGE concurrently filed a petition for variance requesting permission essentially to ignore the interior lot lines of Tracts A, B, and C for purposes of the otherwise required 50 foot building setback in the R.C.–5 Zone. The subject property of the petitions was essentially the assembled 2.8933 acres of Tracts A, B, and C, although only Tract A was implicated technically in the precautionary request to amend the Plan as to the Forwood Property/Fox Ridge Estates. The petitions were assigned Case No. 94–452–XA.

BGE's proposal involved removing the 16.6 megawatt transformer existing on Tract C and, in two phases, constructing an expanded, 64 megawatt substation. Phase I, a 32 megawatt transformer and supporting equipment, would be constructed as soon as possible. According to BGE's electrical service needs forecasting, the Ivy Hill service area (which would include reabsorbing a portion of the original Ivy Hill service area in its southwest corner that had been transferred temporarily to the Delight substation [8] during a power crisis in the winter of 1994 [9]) would need this level of service capability by the year 2001.[10] The forecasts were premised on the following

hearing by an eligible individual or group. We shall consider this regulatory scheme in greater detail in our discussion of Issue II, *infra*.

**8.** Part of the justification for the reabsorption was that the demand in the service area of the Delight substation had been growing more quickly than in the Ivy Hill area. Thus, with the proposed expansion of the Ivy Hill substation's capacity, it was prudent to serve the Ivy Hill area solely out of the Ivy Hill substation and free-up that equivalent capacity at the Delight substation for distribution in the Delight service area.

**9.** The 1994 winter power crisis caused a spike in demand on two separate occasions at the Ivy Hill substation of 20.1 and 18.2 megawatts, respectively.

**10.** BGE projected that the year 2005 was the latest date by which the capacity of Phase I would be consumed fully, though, in reality, BGE believed 2001 or 2002 was a more likely date.

information relevant to the original Ivy Hill service area: (a) current demand from the largely residential existing development (approximately 1750 dwelling units—up from 1000 homes existing in 1985); (b) projected growth of 75 new dwelling units per year, predominantly in the southern part of the service area, based on an analysis of zoning yields and other data obtained from the County government; and (c) an assumed annual electric consumption by 75 dwelling units of .7 megawatt.

BGE projected that Phase II, the addition of a second 32 megawatt transformer and supporting equipment, would be needed to meet service demand and other contingencies beyond the year 2001 because the service area would not have achieved maximum growth by then and because of the general need to be assured of adequate future capacity to be called upon to respond to unforeseen demands [11] and/or a higher degree of efficiency in providing electrical service in the Ivy Hill area. BGE proposed to increase the service area by the addition [12] of a 4 square mile area—Hickory Meadow—bordering on the southeast corner of the original Ivy Hill service area.[13] BGE's projections for the need for and longevity of Phase II's power level, however, were less precise and more open-ended than those for Phase I.

---

**11.** For example, similar to the capability that enabled the switch of service between Ivy Hill and the Delight substation that occurred in the winter crisis of 1994, unused capacity at Ivy Hill apparently could be switched elsewhere within the overall service grid, subject to such physical limitations as the effect on voltage levels and the length of distribution lines to reach the more remote areas.

**12.** According to BGE, this addition to the Ivy Hill substation service area was necessitated by a planned BGE transmission line project which would result in the Texas substation then serving the 4 square mile area no longer being able to perform that function. Accordingly, provision of service to the Hickory Meadow area would be shifted to the Ivy Hill substation.

**13.** BGE's forecast for growth in the Hickory Meadow area, not accounted for in its justification for the Phase I expansion at the Ivy Hill substation, was projected to be 10 dwelling units per year. The existing demand in Hickory Meadow (700 dwelling units) also was not considered in BGE's forecast justification for Phase I.

BGE grounded its decision to seek expansion of the existing Ivy Hill substation location, rather than the possible alternatives of establishing a new substation elsewhere or upgrading another existing substation, on the centrality of the Ivy Hill substation with regard to the electrical load concentrations (existing and projected) within the service area.[14] Moreover, existing connective infrastructure (major supply lines) to and from the Ivy Hill substation would reduce the need to acquire additional rights of way or construct additional capital projects.

The siting of the Phase I and II improvements on the 2.8933 acres, explained by BGE in terms of balancing the goal of achieving maximum screening of views from adjacent properties against the necessity of the functional interrelationships and spacing of the equipment, created the need for the setback variance requested. Although the bulk of the physical installations[15] was to be on Tracts B and C, the bulk of a storm water management area (a potential pond) and a relatively small portion of the vertical structures would be located on Tract A. Thus, the straddling of the interior lot lines of Tracts A, B, and C by the proposed facility necessitated the variance request.[16]

The developmental summary of the BGE proposal disclosed that of the 2.8933 acre site, a storm water management

---

**14.** BGE explained further that the length of the distribution lines to service an area could affect adversely the voltage of the service that could be supplied. Long lines caused voltage level reduction. Maintaining voltage at levels necessary for normal household use by BGE's customers was thus a planning imperative. Moreover, longer lines increase exposure to falling trees or vehicular collisions and thereby diminish to some degree service reliability.

**15.** The tallest structural vertical element proposed was apparently a 14-1/2 foot switching structure.

**16.** BGE's proposal otherwise conformed to or exceeded the BCZR setback requirements with regard to the external boundaries of the assembled property, i.e., the setbacks from lot lines shared with adjacent properties under other ownership.

facility[17] would occupy one-quarter acre and the electrical substation structures[18] would occupy less than an additional one-half acre. A total of three-quarters of an acre of the 1.5977 acres of existing woods on the total site would be removed to make possible the installation of all of the proposed structures. BGE's plan also contained supplemental plantings designed to screen, to some degree, the substation from exterior views.

On 21 June 1994, the Zoning Commissioner conducted a hearing on BGE's petitions and on 24 June issued an order granting them. The neighbors noted a timely appeal of that order to the Board on 21 July. The Board conducted *de novo* evidentiary hearings on 4 October 1994 and 10, 12, 17, and 19 January 1995.

At the Board's hearings, BGE explained that the overarching force driving the need to expand the Ivy Hill substation flowed from its legal obligation as a regulated Maryland public utility to supply its customers with adequate electric service including a reasonable reserve for emergencies.[19] BGE's evidentiary presentation included, among other things, expert witnesses regarding electrical substation construction, electrical demand forecasting, the effect of EMF's (electro-magnetic fields), storm water management, tree planting and forest management, land planning and zoning in Baltimore County, and real estate appraising, together with physical evidence consisting of various photographs, plats, and plans.

---

**17.** There apparently was no storm water management facility required previously when the original 16.6 megawatt substation was constructed on Tract C in 1956. If an on-site management requirement existed, perhaps it was waived, as was the case when the Plan for the Forwood Property was approved.

**18.** The electrical structures, to be painted green for "camouflage" purposes, would be sited within a graveled area encircled by a 7 foot tall, green chain link fence, and topped by an additional 1 foot of razor or barbed wire.

**19.** A BGE witness conceded, however, that BGE's specific proposal to expand the Ivy Hill substation as requested did not require the prior approval of the Maryland Public Service Commission.

Before the Board, the neighbors' evidence aimed to demonstrate that (a) the proposed expansion of the Ivy Hill Substation in both number of square feet of surface area to be occupied by the physical installations (from 1200 to 22,000) and in electrical service capacity (by 400% over the existing 16.6 megawatt transformer) exceeded the legitimate existing and future needs of the original service area (without conceding that such increased capacity was needed even with the proposed augmented service area) and was out of character with the surrounding residential community; (b) the proposed expansion would have a deleterious effect on the property values of the surrounding community; (c) BGE's proposal, insofar as it proposed development on Parcel A, failed to follow the procedures prescribed by the BCZR for amending the approved Plan for the Fox Ridge Estates subdivision; and (d) BGE had failed to produce adequate evidence to justify the grant of the variance from the interior lot line setback requirements. The neighbors themselves provided the bulk of the testimonial and documentary evidence regarding these points, but also marshaled an expert real estate appraiser, Mr. Ernest Kern, who opined generally that the existence of the enlarged substation would diminish the value of the surrounding properties and homes.[20] Moreover, the neighbors produced an expert urban planner, Mr. Norman E. Gerber, a former Director of Planning for the County, who testified in support of their opposition. Mr. Gerber opined: (a) the BCZR provisions for amending the Plan for the Fox Ridge Estates subdivision had not been followed; (b) even if the proper procedures had been followed, the BGE proposal as to Tract A could not be approved under the criteria for a Plan amendment; (c) BGE's overall proposal would be detrimental to the welfare of the neighborhood, overcrowd the surface area of Tracts A, B, and C, and would be inconsistent with the

---

**20.** Mr. Kern, although not having performed appraisals of any particular property in the neighborhood, based his opinion on other studies of the effects of power lines and substations on property values, information supplied by the neighbors and others, and his own experience and education.

purpose of the R.C.–5 zone as it exists in this community, all contrary to the required findings that must be made, as provided in the BCZR, before a special exception can be approved; and, (d) as to the variance request, in addition to characterizing BGE's proposal as overcrowding its property, there was nothing unique or unusual about the physical characteristics of the BGE parcels when compared to the surrounding residential properties.

The Board issued its written opinion on 31 May 1995, granting both the special exception [21] and the variance. In reaching these decisions, the Board explained, in pertinent part:

> Protestants [the neighbors] allege that, due to the ... parcel known as Tract A, the plan which is the subject of this hearing should have gone to the Planning Board for advice on the appropriateness of the instant case in relation to the final development plan [for Forest Ridge Estates] .... the Board agrees with the Petitioner [BGE] that the subject case is not a deviation from the final development plan, and, in fact, that the transfer of title of Tract A to the Baltimore Gas & Electric Company (hereinafter "BGE") occurred prior to the sale of other lots within the development. Therefore, this case is properly before the Board.
>
> The facts in the case are essentially undisputed ... The issues before this Board are whether (a) BGE is able to meet the tests under Section 411 of the *Baltimore County Zoning Regulations* (hereinafter "BCZR") for public utility uses; (b) whether, due to the nature of the proposed development, the tests pursuant to Section 502.1, Special Exceptions, are met; and (c) whether the Petitioner is due

21. Two conditions were attached to this approval, both relating to the proposed supplemental landscaping around the physical elements of the substation. One condition doubled the amount of the proposed landscaping and increased the height of the specimen trees from 8'–10' to 10'–12'. The other condition related to maintenance and replacement of the landscaping.

variances from interior lot lines between Tracts A, B and C, pursuant to Section 307, Variances, of the BCZR.

\* \* \* \* \* \*

The first issue to be decided by this Board, therefore, is the question of need pursuant to Section 411 of the BCZR regarding distribution of electric power. Petitioner brought evidence and testimony by an expert in forecasting electric demand, James F. Ryan. Protestants offered the testimony of Ronald P. Hanley, an employee for a waste collection and recycling company, and one who had three courses in statistics at Pennsylvania State University, and who prepared various graphs which were introduced into evidence. According to the testimony of Charles S. Taylor, an engineer and expert in the area of electrical system planning, the BGE franchise with the Public Services [sic] Commission in the State of Maryland is required to supply power at all times and satisfy all demands. In short, the obligation of the Petitioner is to serve the demand at peak periods. The Protestants allege that the peak demand experienced on one day in the winter of 1994 was, admittedly by the Petitioner's witness, a one-time occurrence; however, that one-time occurrence established the new demand.

It was well established during the course of evidence and testimony that existing demand, prior to the single-day occurrence in 1994, is not met by the existing substation capacity; therefore, need for enlargement of the substation given current demand is justified. As indicated by Petitioner's experts, future demand is forecasted and is the basis for establishing future demand in designing facilities such as the Ivy Hill Substation. The analysis of the need comparison versus capacity presented by Protestants' witness, Mr. Hanley, points to a future need for increased capacity from this substation. Protestants would have the petitioner increase the capacity of the substation in increments which stay just ahead of demand. The Board notes that such alteration of the substation places unreasonable engineering constraints and unnecessary additional cost to the ultimate development of this site. Such costs would be unnecessarily

borne by all electric consumers for the benefit of those in the surrounding community. The Public Services [sic] Commission dictates that BGE must provide sufficient power to exceed demand. Petitioner has obviously met its burden of proof to Section 411 as buttressed by the evidence presented by Protestants in their graphic analysis of need versus capacity.

The Protestants further allege that the Ivy Hill Substation should not be used to supply power to areas outside of their own locale. Again, BGE was able to demonstrate that, because of its requirement to provide power, it was forced into the position of switching power distribution away from the Ivy Hill Substation as a result of the peak demands in 1994, creating a similar condition at the nearby Delight Substation in Owings Mills, an area growing even faster than the area surrounding Ivy Hill.

The Board therefore finds as a fact that not only has need been demonstrated but that in further reviewing the requirements of 502.1 the health, safety and welfare of the general public is suspect when required power is not delivered to the homes served by the substations as mandated.

\* \* \* \* \* \*

Regarding [BCZR § ]502.1G, the Board agrees with the testimony of Mr. [George] Gavrelis [BGE's expert with regard to land planning and zoning] when he states that the R.C. 5 zone permits some public utility uses as a matter of right and others as special exceptions which are presumed to be valid uses. The mere existence of homes in the R.C. 5 zone points to their need for power transmission; therefore, the reasoning follows that facilities to provide the transmission of power as a natural consequence of the existence of those homes dictates that not only are electric substations consistent with the purposes of the property's zoning classification but are a need to be fulfilled, in the allowance of development in the R.C. 5 zone.

Regarding [BCZR § ] 502.1H, the Board heard testimony from Mr. Gavrelis and Monica McGrady, BGE project engi-

neer and an expert in site planning, that because of the intent to raze the existing structures which include a residence and swimming pool, coupled with the planned siting of equipment within the cleared area and the additional landscaping, the impermeable surface and vegetative retention provisions are met by the subject Petition. Concerning 502.1A, the Board did hear testimony from experts in property values from both the Petitioner and Protestants; the Board recognizes that one of the concerns in regard to property values is the visual impact that an enlarged substation presents. The Board is not compelled by the argument that property values will be negatively impacted; however, the Board recognizes that the residents have come to be familiar and comfortable with what has been termed the pastoral setting of the neighborhood. In recognizing that BGE is meeting the requirements for vegetative retention provisions of the regulations, the Board is compelled to require as part of any improvements pursuant to this Petition to include landscaping which serves to provide a visual buffer between the subject site and surrounding properties, in deference to the adjoining property owners. Therefore, the Board will grant the special exception, subject to restrictions.

The Petitioner finally must meet the tests under [BCZR] Section 307.1 in pursuing variance from lot line setbacks, said lot lines existing between tracts owned by the Petitioner. George Gavrelis clearly points out in his testimony that Section 306 of the BCZR speaks to lot area regulations for erecting substations. The Petitioner seeks a variance under 307.1 from BCZR 1A04.3B.3 which requires a 50–foot setback from any lot line other than a street line. The Board finds as a fact that Section 306 applies in this case and that the application for a variance under 307.1 may be treated as moot. The Petitioner recognizes that its placement of electric utility structures on the subject site, straddling interior lot lines and certainly within otherwise required setbacks, may be construed under 1A04.3B.3 as a principal building, and is therefore requesting such variance. The Board is

compelled to address the issue of 307.1 pursuant to the Petition. As stated by Mr. Gavrelis in his testimony, the Board finds that the application of Section 306 points to the fact that public utilities are unique in their requirements. Therefore, the spirit and intent of the BCZR in height, area, off-street parking and sign regulations are met by the subject Petitioner. Since the Petitioner seeks relief from 1A04.3B.3, the Petitioner must meet the tests in trying to prove that special circumstance or conditions exist that are peculiar to this land or structure that is the subject of the variance request. In *David Cromwell v. Arthur Thomas Ward, III,* [102 Md.App. 691, 651 A.2d 424 (1995) ] . . . the Court of Special Appeals [of Maryland] states that the conditions which are peculiar to the land or structure must be met before the tests for strict application of the BCZR and any resulting practical difficulty or unreasonable hardship are reviewed. The Board finds as a fact that the existing electrical substation is a substation which is far undersized in capacity for the required demand in the existing locale. An immediate need in increased capacity has been adequately demonstrated to address the issue of an unusual condition which exists with the existing structure. BGE is mandated to increase the capacity of any substation in order to stay ahead of demand. The conditions which exist in the existing substation are unique in that BGE has been unable to even meet existing demand. The Board finds that the existing conditions and insufficient capacity force BGE to increase capacity; furthermore, in order to accommodate existing and increasing demand, in accordance with its requirements under its Public Services franchise, as well as nationally recognized and accepted building codes and standards, a condition exists which requires sufficient area to accommodate the needs of an enlarged substation. The Board therefore finds that the first test under 307.1 has been met. The land on which the substation will sit is divided by interior lot lines.

The second test under 307.1, assuming the first has been met, is that strict compliance with the zoning regulations

would result in practical difficulty or unreasonable hardship. In order to require BGE to comply strictly with the setback requirements, the Board would be asking BGE to deviate from the aforementioned nationally recognized building and electrical codes, as well as sound engineering practices, on consolidating all substation equipment to the extent possible under this Petition. That deviation creates a practical difficulty in causing BGE to design a facility which would not conform to those standards. Furthermore, the Board finds as a fact that BGE's proposal, in consolidating the substation equipment to a central location within the three tracts, provides for the maximum setback from adjoining property owners, allowing for the greatest opportunity from visual and other alleged impacts. Because the Board finds that strict compliance would result in practical difficulty, the Board is not required to address the issue of unreasonable hardship.

The neighbors, on 16 June 1995, sought judicial review in the Circuit Court for Baltimore County of the Board's action. When they realized that BGE had initiated the local permitting process, intending to commence construction in reliance on the recently granted special exception and variance, the neighbors sought and obtained from the circuit court (DeWaters, J.) on 30 June 1995 a stay of the Board's decision. This stay stymied BGE's ability to proceed through the permitting process until the merits of the judicial review petition could be heard and decided.

On 28 July 1995, BGE filed a motion to dismiss the neighbors' appeal of the variance approval. BGE premised its theory of the neighbors' lack of standing to challenge the interior lot line setback variance on the neighbors' alleged lack of demonstrable and special aggrievement, inasmuch as the BGE proposal would meet or exceed the setback requirement from any of the neighbors' properties vis à vis the external lot lines of the assembled BGE parcels. Consequently, BGE reasoned, no neighbor had demonstrated that a particularized adverse effect would result if BGE were allowed to ignore the internal lot lines for purposes of clustering the substation

equipment in the center of its assembled parcels. Rather, BGE asserted that the clustering design enabled it to better meet or exceed the setbacks and landscape screening of the installation from the neighbors properties.

After considering the parties' memoranda of law, the court filed on 30 December 1996 its well reasoned and written 24 December 1996 opinion and order denying the neighbors' petition for judicial review and effectively affirmed the Board's decision.

Prior to noting their appeal to us on 6 January 1997, the neighbors sought from the circuit court a further stay of BGE's ability to complete the local permitting process based on the approved (and now affirmed) special exception and variance. That request was denied by written order dated 31 January 1997.

At the same time they filed their motion for further stay, the neighbors also filed a Rule 2–534 motion to alter or amend judgment. The motion requested that the court allow them to offer additional evidence, which purportedly they did not become aware of until after oral argument on the merits in the circuit court[22] but before the court's 24 December 1996 opinion and order; the evidence concerned revised real property tax valuations made by the Maryland Department of Assessments & Taxation the properties owned by the Hanleys, the O'Haras, the Follos, the Rytters, the Browns, and the Howses.[23] The revised valuations reflected for the levy year 1996–97 reduced "full cash value" from those proposed in December 1995 assessments. The written notices of the revised, reduced

---

**22.** Based on the joint record extract provided, we are not able to verify definitely when oral argument occurred. The parties tell us, however, that it occurred on 20 July 1995.

**23.** The affidavit of Mr. Lansman indicated that he did not receive a revised notice of valuation except perhaps by virtue of having appealed successfully his December 1995 assessment notice. His appeal was noted 6 February 1996. We were not informed, nor was the circuit court apparently, when the appeal was decided exactly nor the reasons why, except in the hearsay words of Mr. Lansman, the State reduced the valuation in his appeal.

values were dated 23 August 1996 and the affected neighbors acknowledged that they received the notices shortly thereafter (except in the case of the O'Haras, whose notice was dated 27 September 1996 and received the same date). On the face of the notices, each adjustment in full cash value was explained as "for proximity to Baltimore Gas and Electric substation and economic obsolescence." Further, this explanation was reached apparently after a State assessor had visited the neighborhood on 20 May 1996.[24] The circuit court denied the motion to alter or amend by written order dated 3 February 1997.

In addition to the neighbors' appeal, BGE cross-appealed the circuit court's denial of its motion to dismiss the neighbors' petition for judicial review as to the variance.

### Standard of Review

As Judge Eyler recently stated for us:

[T]here are two general standards of review of a decision of a zoning board:

In regard to findings of fact, the trial court cannot substitute its judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record; when reviewing findings of law, however, no such deference is given the agency's conclusion.

(quoting *Columbia Road Citizens' Assoc. v. Montgomery County,* 98 Md.App. 695, 635 A.2d 30 (1994)). *See also Liberty Nursing v. Department,* 330 Md. 433, 442–43, 624 A.2d 941 (1993) (discussing administrative review generally); *Caucus v. Maryland Securities,* 320 Md. 313, 323–24, 577 A.2d 783 (1990) (same).

*People's Counsel v. Prosser Co.,* 119 Md.App. 150, 704 A.2d 483, 492 (1998) (citing *Colao v. Prince George's County,* 109

---

**24.** In the case of the O'Haras, the assessor's apparent site visit occurred on 4 September 1996.

Md.App. 431, 458, 675 A.2d 148, aff'd, 346 Md. 342, 697 A.2d 96 (1997)). On this score, only a little more need be said.

With regard to Charter counties particularly, such as Baltimore County, Md.Code, art. 25A, § 5(U) (1996 Repl.Vol., 1997 Supp.),[25] courts may reverse or modify decisions of the Board "if ... not in accordance with law." *See* Baltimore County Code, Charter § 604.

■■■ The substantial evidence standard applicable to the Board's findings of fact and resolution of mixed questions of law and fact, sometimes referred to as the "fairly debatable" test, is implicated by our assessment of whether the record before the Board contained at least "a little more than a scintilla of evidence" to support the Board's scrutinized action. *See Anne Arundel County v. A–PAC, Ltd.,* 67 Md.App. 122, 126, 506 A.2d 671 (1986) (quoting *Floyd v. County Council,* 55 Md.App. 246, 258, 461 A.2d 76 (1983)). If such substantial evidence exists, even if we would not have reached the same conclusions as the Board based on all of the evidence, we must affirm. Stated another way, substantial evidence pushes the Board's decision into the unassailable realm of a judgment call, one for which we may not substitute our own exercise of discretion. Of course, on pure questions of law, we extend no deference to the Board (or the circuit court for that matter) beyond the weight merited by the persuasive force of the reasoning employed.

## I.

■■■ BGE asserts initially that the record fails to demonstrate that the neighbors possess the necessary aggrievement to establish standing to obtain judicial review of the Board's grant of the variance. In support of this contention, BGE essentially maintains that, because the variance pertains to lot line setback requirements internal to its assembled lots and

---

**25.** There has been no substantive revision to this statutory provision of consequence to the instant case between the operative events of this appeal and now.

BGE's development proposal for those lots otherwise meets the external lot line setback requirements relative to the neighbors' properties,[26] the neighbors did not, indeed cannot, demonstrate the special damage or adverse effect necessary to support aggrievement. BGE's dexterous argument will not prevail.

The recent opinion of the Court of Appeals in *Sugarloaf v. Dept. of the Environment*, 344 Md. 271, 686 A.2d 605 (1996), although involving questions of judicial review of a decision by a State administrative agency, is very instructive regarding BGE's standing challenge here. In its discussion of the common law definition of "aggrieved" as applicable to judicial review of the actions of administrative bodies generally, inclusive of the Board's in the instant case, the Court observed that

> in order to be "aggrieved" for purposes of judicial review, a person ordinarily must have an interest " 'such that he is personally and specifically affected in a way different from ... the public generally.' " *See Maryland–Nat'l v. Smith*, *supra*, 333 Md. at 11, 633 A.2d at 859; *Abramson v. Montgomery County*, 328 Md. 721, 733, 616 A.2d 894, 900 (1992); *DuBay v. Crane*, 240 Md. 180, 185, 213 A.2d 487, 489–490 (1965) ("the [administrative] decision must not only affect a matter in which the protestant has a specific interest or property right but his interest therein must be such that he is personally and specially affected in a way different from ... the public generally").

*Sugarloaf*, 344 Md. at 288, 686 A.2d 605 (some internal citations omitted). With respect to the question of judicial standing in an administrative law context, the Court cautioned:

> In cases involving challenges to administrative land use decisions, there is a distinction between standing in court to obtain review of the governmental action and the merits of the challenger's position. Thus, in *Bryniarski v. Montgomery Co.*, 247 Md. [137] 145–146, 230 A.2d [289] 295 [(1967)],

---

**26.** The latter scenario arguably is achievable only with the grant of the variance.

involving the administrative grant of a special exception permitting the construction and operation of an apartment hotel, this Court stated:

"The status of a person to [obtain judicial review] as a 'person aggrieved' is to be distinguished from the result on the merits of the case itself.... If, on the merits, the board acted properly in approving the application, the protesting property owner is not damaged *in law*, however much he may be damaged *in fact.* His damage is then *damnum absque injuria.* Because the result on the merits might be adverse, however, does not mean the protestant would not have status to challenge the board's action."

*Id.* at 294–95, 686 A.2d 605 (some internal citations omitted) (emphasis in original).

■ Courts consider challenges to a litigant's standing on a case-by-case basis. Guidance for these ad hoc determinations in land use cases also is available in *Sugarloaf.*

In actions for judicial review of administrative land use decisions, "[a]n adjoining, confronting or nearby property owner is deemed, *prima facie*, ... a person aggrieved. The person challenging the fact of aggrievement has the burden of denying such damage in his answer to the petition for [judicial review] and of coming forward with evidence to establish that the petitioner is not, in fact, aggrieved." *Bryniarski v. Montgomery Co., supra,* 247 Md. at 145, 230 A.2d at 294. *See, e.g., Md.-Nat'l Cap. P. & P. v. Rockville,* 269 Md. 240, 248, 305 A.2d 122, 127 (1973) (indicating that one who "owns any property located within sight or sound of the subject property" is aggrieved); *Wier v. Witney Land Co.,* 257 Md. 600, 612–613, 263 A.2d 833, 839 (1970) (" 'At least three of the protestants ... are in sight distance of the property forming the subject of the petition.... These protestants were ... nearby property owners and are deemed, *prima facie,* to be specially damaged and, consequently, persons aggrieved' "); *Chatham Corp. v. Beltram,* 252 Md. 578, 251 A.2d 1, 4 (1969) ("In light of the testimony of Mr. Beltram and Mrs. Hahn with reference to

the proximity of their homes within the same subdivision to the reclassified area ... there was no error in the ruling that [they] had standing to sue"); *Aubinoe v. Lewis*, 250 Md. 645, 650–652, 244 A.2d 879, 882–883 (1968); *The Chatham Corp. v. Beltram*, 243 Md. [138] 148, 220 A.2d [589] 595 [(1966)] ("Since Beltram's evidence was that he owned property, in which he lived, in close proximity to the reclassified land ..., there was no error in ruling that Beltram had standing to sue"); *Toomey v. Gomeringer*, 235 Md. 456, 460, 201 A.2d 842, 844 (1964) (although "the protestants' properties were more than two city blocks away from the property for which rezoning was sought," they were accorded standing); *Bd. of Zoning Appeals v. Bailey*, 216 Md. 536, 539, 141 A.2d 502, 503 (1958) (standing accorded to zoning reclassification protestants who lived "three-fourths of a mile by road and between one-third and one-half a mile as the crow flies" from the subject property).

*Id.* at 297–98, 686 A.2d 605 (Emphasis in original.)

■ Considering the case at hand, we observe initially that BGE offered no additional evidence to the circuit court, bearing on the issue of the neighbors' standing, than was otherwise part of the record before the Board. As we noted *supra* at n. 4, virtually all of the neighbors own and reside on property situated to the south and east of the southerly boundary of Tract A of the BGE property, separated only by a 24 foot wide, paved residential subdivision road (Joel Court). Certain neighbors (the Follos and the Howses) testified expressly that their homes were within 300 feet of the BGE property. We are unwilling to conclude that the neighbors, or at least some of them,[27] did not demonstrate that their properties were in close proximity to the subject properties of BGE's variance application. Moreover, many of the neighbors complained, at a minimum, of perceived visual objections to BGE's proposed,

---

27. It is a settled principle of Maryland law that "where there exists a party having standing to bring an action ... we shall not ordinarily inquire as to whether another party on the same side also has standing." *Sugarloaf,* 344 Md. at 297, 686 A.2d 605 (citations omitted).

clustered improvements and of anticipated adverse effects flowing therefrom as to the value of their homes and realty. We are satisfied, as was the circuit court, that the neighbors presented an adequate *prima facie* case of their standing to challenge the grant of the variance, which BGE failed to rebut persuasively.

The variance would enable BGE to cluster or mass its improvements in the center of the assembled parcels, heedless of the internal lot line setback requirement. Though debatable that such site design leads to beneficial impacts on the surrounding community (and is otherwise justifiable on electrical engineering bases), such an assertion arguably opens the door also to balancing considerations of the potentially adverse visual effects of the massing of the equipment. Thus, the variance request, for purposes of establishing judicial standing to challenge its grant, bears an articulable and rational connection to the neighbors' concerns, even though the focus of the request is internal to BGE's property.

## II.

A flagship issue of this appeal appears to be the neighbors' two-fold assertion that (1) BGE's development proposal as to Tract A was required to, but did not, receive Planning Board review and approval, as required at the time for an amendment to the previously approved Final Development Plan for the Forwood Property/Fox Ridge Estates subdivision; and, (2) regardless of which governmental entity properly may review and approve amendment proposals to an approved Plan under the circumstances, BGE's proposal as to Tract A could not satisfy the BCZR requirement that such amendment be found "consistent with the spirit and intent of the original plan." BCZR § 1 BOL. 3(A)(4).

The threshold question that must be answered before launching into any close analysis of the neighbors' two arguments is whether BGE's proposed uses on Tract A triggered a formal Plan amendatory process at all. Indeed, as the Board explained as its primary reason for concluding that no amend-

ment was required, BGE's proposal was "not a deviation from the final development plan."

The pertinent BCZR provisions with regard to final development plans generally, and amendments thereto specifically, are as follows: [28]

1B01.3—Plans and Plats.

 A. Development Plans.

 1. Purpose. This paragraph is intended:

 a. to provide for the disclosure of development plans to prospective residents and to protect those who have made decisions based on such plans from inappropriate changes therein; and

 b. to provide for review of residential development plans to determine whether they comply with these regulations and with standards and policies adopted pursuant to the authority of Section 504.

 \* \* \* \* \* \*

 5. Forms and Content of Plans.

 \* \* \* \* \* \*

 b. Content. Each partial and final development plan must show: the locations, types, and exterior dimensions of all proposed structures and all existing structures to be retained; generalized floor plans to scale; layout of parking facilities; streets and drives giving access to and lying within the tract; existing topography and major vegetation; proposed grading; common amenity open space (including local open space); all additional information that may be required under procedures adopted pursuant to the authority of Section 504; and all additional information which is necessary, as determined by the zoning commissioner and the director of Planning, to ascertain whether the project will comply with the zoning and subdivision require-

---

**28.** Development of a residential subdivision in the R.C.–5 Zone, such as the Forwood Property, required approval of a final development plan.

ments of Baltimore County. The plan shall contain the note that landscaping and screening shall conform to the standards contained in the Baltimore County Landscape Manual adopted pursuant to Section 22–105 of Title 22 of the Baltimore County Code.

\* \* \* \* \* \*

7. Amendment of Approved Development Plans. After partial or final development plans have been approved as provided under Subparagraph 6, preceding, they may be amended only as provided below.

a. Amendment Prior to Sale of Interest in Nearby Property. The development plans may be amended by simple resubmission, or by the submission of appropriate documents of revision, subject to the same requirements as are applied to original plans, if there is no change with respect to any lot, structure, or use within 300 feet or a lot or structure which has been sold since the original plans were filed.

b. Amendment After Sale of Interest in Nearby Property or Upon Demand for Hearing. In the case of an amendment not allowed under Sub-subparagraph a, by reason of sale of property within the area, or in case of a demand for hearing by an eligible individual or group, the plans may be amended through special exception procedures, in the manner provided under Section 502 and subject to the following provisions:

(1) The amendment must first be approved by the Planning Board as being in accord with provisions adopted under the authority of Section 504.

(2) The amendment must be in accord with the specific standards and requirements of this article, as determined by the Office of Planning and Zoning.

(3) Only an owner of a lot abutting or lying directly across a street or other right of way from the property in question, an owner of a structure on such a lot, or a homes association (as may be defined under the subdivision regulations or under provisions adopted pursuant

to the authority of Section 504) having members who own or reside on property lying wholly or partially within 300 feet of the lot in question are eligible to file a demand for hearing.

(4) It must be determined in the course of the hearing procedure that the amendment would be consistent with the spirit and intent of the original plan and of this article.[29]

 As noted previously, the Zoning Commissioner approved the Plan for the Forwood Property/Fox Ridge Estates subdivision on 27 May 1988. The Plan depicted a development of twenty-four single family, detached residences on numbered lots, plus Tract A. For each of the numbered lots, house locations and orientations, building envelopes, typical off-streeting layouts, well locations, soil types, topographic data, and other development information were provided graphically and statistically. In contrast, however, stood Tract A. The Plan provided no statistical or graphic development proposal for Tract A, except for the notation that it was "to be conveyed to adjoining property owner BGE Co." Further, arrows indicating the relationship of Tract A to the existing BGE property (Tract C) were superimposed across the common boundary line of the two tracts. As we know from other evidence in the record, the 16.6 megawatt electrical transformer had been in existence on Tract C since 1956. The

---

**29.** Effective 21 May 1995, former sub-sections (b)(1) and (2) were deleted, a new sub-section (b)(1) was added, and former sub-sections (b)(3) and (4) were renumbered (b)(2) and (3), respectively, by Bill No. 29–95 adopted by the County Council of Baltimore County, Maryland. New sub-section (b)(1) provided that:

(1) The amendment must be in accord with the provisions of The Comprehensive Manual of Development Policies and with the specific standards and requirements of this article, as determined by the Office of Planning and Zoning. The Director, on behalf of The Planning Board, shall notify the Zoning Commissioner accordingly.

Although the neighbors assert that the adoption of Bill No. 29–95 impliedly reflects an acknowledgment that the prior administrative delegation of the Planning Board's responsibilities under former sub-section (b)(1) to the Planning Director was illegal, we need not decide that contention in view of our ultimate holding on this issue.

subdivision plan for the Forwood Property/Fox Ridge Estates, recorded on 23 August 1988, also depicted no development on Tract A, contrasted with the homes shown on the twenty-four numbered lots. Tract A was conveyed to BGE before any of the residentially-denominated lots in the Plan were marketed or conveyed.

Clearly, the Plan did not propose residential development on Tract A. That being the case, much of the specific informational requirements of BCZR § 1B01.3A for inclusion on a final development plan appear inapplicable to Tract A. That no more explicit development plan for Tract A was itemized on the Plan is, of course, what powers the instant controversy. The neighbors cry foul, asserting that they were surprised when they learned of BGE's plans for Tract A following the variance and special exception filing in May 1994. BGE impliedly decries as disingenuous the neighbors' claims of surprise. BGE points to presumably mandatory inferences that a reasonable person would draw from the facts that the Plan, in substance, alerted any reader that Tract A would become the property of BGE and, in all likelihood, given the existence of the existing 16.6 megawatt substation on the abutting Tract C and the absence of a contrary development proposal for Tract A, would become subject to at least some public utility use that implicated the principal, if not sole, activity engaged in by the prospective owner, i.e., providing electrical service to its customers.

Mr. Gavrelis, BGE's expert witness regarding zoning and land planning in Baltimore County, testified, among other things, that BGE's plans for Tract A were "in absolute accord with [the Plan] for Tract A." He based this opinion on the Plan's notations as to Tract A's prospective conveyance to BGE and the arrows linking it to Tract C, upon which the existing substation was located. He further expressed his opinion that the Plan notes predicted BGE's future use to such an extent that subsequent purchasers of the residential lots within the remainder of the Forwood Property/Fox Ridge Estates subdivision were on notice of the likely future use of

Tract A, consonant with the purpose articulated in BCZR § 1B01.3(A)(1)(a).[30]

We conclude that the Board had before it an adequate factual record to support its conclusion that no amendment to the Plan was required under the circumstances of this case. Moreover, the Board correctly interpreted BCZR § 1B01.3(A) and applied it to the facts as the Board found them to be. Because we agree with the Board's and circuit court's disposition of this issue, we need not address the neighbors' two-fold argument, because both of its elements necessarily assume that an amendment to the Plan was required.

## III.

BCZR § 307.1 provides as follows with regard to variances: [31]

The zoning commissioner of Baltimore County and the County Board of Appeals, upon appeal, shall have and they are hereby given the power to grant variances from height and area regulations, from off-street parking regulations and from sign regulations, only *in cases where special circumstances or conditions exist that are peculiar to the land or structure which is the subject of the variance request and where strict compliance with the zoning regulations for Baltimore County would result in practical diffi-*

---

**30.** In passing, we noted earlier in this opinion, *see supra* p. 10, that only a very small part of the expanded Ivy Hill substation facility was proposed to be located on Tract A. Of the physical installations proposed by the special exception, most of the on-site storm water management pond, an at-grade or below-grade facility, was to be on Tract A (0.1856 acre of the total 0.2421 acre surface area of the pond). Of the vertical structures proposed by the special exception, those proposed on Tract A (within the overall fenced area) covered 0.0331 acre of Tract A's total 1.5628 acres. A comparison of the development statistics for Tracts A, B, and C (BGE's Exhibit 16 before the Board) places in perspective the relatively modest impact of the development to occur on Tract A.

**31.** For an excellent discussion of the distinctions between special exceptions and conditional uses on one hand and variances, see *Cromwell v. Ward,* 102 Md.App. 691, 699–703, 651 A.2d 424 (1995).

*culty or unreasonable hardship.* No increase in residential density beyond that otherwise allowable by the zoning regulations shall be permitted as a result of any such grant of a variance from height or area regulations. Furthermore, any such variance shall be granted only if in strict harmony with the spirit and intent of said height, area, off-street parking, or sign regulations, and only in such manner as to grant relief without injury to public health, safety, and general welfare. They shall have no power to grant any other variances. Before granting any variance, the zoning commissioner shall require public notice to be given and shall hold a public hearing upon any application for a variance in the same manner as in the case of a petition for reclassification. Any order by the zoning commissioner or the County Board of Appeals granting a variance shall contain a finding of fact setting forth and specifying the reason or reasons for making such variance.

(Emphasis added.)

■■■ BGE sought a variance in this case from BCZR § 1A04.3(B)(3)'s area regulation in the R.C.–5 zone that required that "[a]ny principal building . . . constructed . . . shall be situated . . . at least 50 feet from any lot line other than a street line." The aspect of BGE's special exception application that, in the exercise of caution, dictated the need for such a variance was the clustering of the expanded Ivy Hill substation equipment in the center of the assembled Tracts A, B. and C. That siting arguably would not be possible if the equipment (if treated as a "principal building") had to be set back 50 feet from the internal lot lines of the 3 tracts.[32]

---

32. The Board initially determined that the variance request was moot, i.e. not needed, because BCZR § 306 excused BGE's proposal from having to comply with the ordinary internal lot line setback requirements. BCZR § 306 provided:

Section 306 —MINOR PUBLIC UTILITY STRUCTURES
Minimum lot area regulations in any zone shall not apply to repeater, booster, or transformer stations, or small community dial offices.

As noted previously, the Board explained, in pertinent part, its grant of the variance:

> Section 306 points to the fact that public utilities are unique in their requirements. Therefore, the spirit and intent of the BCZR in height, area, off-street parking and sign regulations are met by the subject Petitioner.

* * * * * *

> The Board finds as a fact that the existing electrical substation is a substation which is far undersized in capacity for the required demand in the existing locale. An immediate need in increased capacity has been adequately demonstrated to address the issue of an unusual condition which exists with the existing structure. BGE is mandated to increase the capacity of any substation in order to stay ahead of demand. The conditions which exist in the existing substation are unique in that BGE has been unable to even meet existing demand. The Board finds that the existing conditions and insufficient capacity force BGE to increase capacity; further, in order to accommodate existing and increasing demand. The Board finds that the existing conditions and insufficient capacity force BGE to increase capacity; furthermore in order to accommodate existing and increasing demand, in accordance with its requirements under its Public Services franchise, as well as nationally recognized and accepted building codes and standards, a condition exists which requires sufficient area to accommodate the needs of an enlarged substation. The Board therefore finds that the first test under 307.1 has been met.

* * * * * *

The second test under 307.1, assuming the first has been met, is that strict compliance with the zoning regulations would result in practical difficulty or unreasonable hardship. In order to require BGE to comply strictly with the setback

---

BGE, in its brief, offers no argument in support of this basis for the Board's action. As no appellate argument has been put forward in this regard, we shall not consider this point further.

requirements, the Board would be asking BGE to deviate from the aforementioned nationally recognized building and electrical codes, as well as sound engineering practices, on consolidating all substation equipment to the extent possible under this Petition. That deviation creates a practical difficulty in causing BGE to design a facility which would not conform to those standards. Furthermore, the Board finds as a fact that BGE's proposal, in consolidating the substation equipment to a central location within the three tracts, provides for the maximum setback from adjoining property owners, allowing for the greatest opportunity from visual and other alleged impacts. Because the Board finds that strict compliance would result in practical difficulty, the Board is not required to address the issue of unreasonable hardship.

The neighbors argue that the Board's decision is erroneous because BGE produced no or insufficient evidence of the uniqueness of its site, relative to the surrounding neighborhood, to support the Board's conclusion "that the first test under 307.1 ['special circumstances or conditions exist that are peculiar to the land or structure which is the subject of the variance request'] has been met." In support of this contention, the neighbors offer us snippets of the cross-examination testimony before the Board of BGE's expert on zoning and land planner (Mr. Gavrelis) and compare that to a summary of the relevant testimony of their dueling expert (Mr. Gerber). They summarize Mr. Gerber's testimony in this regard as reflecting "that the subject site consisting of three separate parcels [was] no different than any other parcel in the neighborhood in that it is flat, moderately forested, with no unusual physical features." Turning to bits of Mr. Gavrelis's testimony excerpted from his cross-examination, the neighbors proclaim them the sole support for the Board's conclusions. In one of these extractions set forth in the neighbors' brief, Mr. Gavrelis responds to some follow-on questions from appellants' counsel as to what he believes may be different (only inferentially relative to the other land in the neighborhood) about the combined 3 tracts, other than their tree cover:

A. There's a substation already there.

Q. Exactly. And other than that?

A. It has existing infrastructure.

Q. It has lines serving it in and out?

A. Exactly.

Q. Other than that?

A. I think that's enough.

Additionally, the neighbors point out, with regard to BGE's acquisition of Tracts A and B, that BGE knew or should have known at those times that it would be expected to meet the setback requirements as to the internal lot lines created by the land assemblage and, therefore, that the present request for a variance was generated solely by an impermissibly self-inflicted practical difficulty or unreasonable hardship.

BGE naturally takes a more expansive view of the evidence (and relevant law and regulations) before the Board. Parsing out the individual variance requirements of the BCZR, it directs our attention first to evidence of special circumstances with respect to the *structures* for which the variance was sought. BGE first notes its general legal mandate to supply adequate electric service to its customers, even in emergencies. *See* Md.Code (1957, 1995 Repl.Vol.), Art. 78, § 28(c) (Public Service Commission Law); Md.Code (1957, 1995 Repl. Vol.), Art. 78, § 75(a); COMAR 20.50.02.03.[33] Moving from

---

**33.** Article 78, Section 28(c) of the Maryland Code (1957, 1995 Repl. Vol.) (Public Service Commission Law), provides:

> § 28. Affirmative duties generally; conservation duties of gas and electric companies.
>
> Every public service company shall, in addition to such other duties as may be specifically imposed by this article:
>
> * * * * * *
>
> (c) Furnish instrumentalities, utilities, services, and facilities which are safe, adequate, just, reasonable, economical, and efficient, giving consideration to the conservation of natural resources and the quality of the environment.

Article 78, Section 75(a) provides:

> § 75. Expiration, abandonment or discontinuance of franchise.
>
> (a) *Commission may require continuance of service; consent of Commission to discontinuance required.*—The Commission may re-

the general to the specific, BGE alludes to the evidence with regard to the Fall 1994 power crisis at the existing 16.6 megawatt Ivy Hill substation, the future energy needs of the Ivy Hill service area (as originally defined and as proposed to be augmented) as forecasted by its experts, and the civil and electrical engineering testimony of other of its experts with regard to why the proposed equipment for the enlarged substation, based on both national code standards and specific electrical/civil engineering requirements, needed to be massed in the fashion proposed. Moreover, BGE asserted that the needed expansion could not be accommodated on any one of the 3 tracts and still meet the lot line setback requirements in any event. Collaterally, and of no direct bearing on fulfillment of this criterion for the grant of a variance, the massing of the new equipment enabled BGE to screen more effectively the facility from the surrounding properties.[34]

---

quire the continuance of any service rendered to the public by any public service company under any franchise, right, or permit, after its expiration date, if any; and no service under a franchise, right or permit shall be discontinued or abandoned without the consent of the Commission, which shall be granted if the Commission finds that the present or future public convenience and necessity permits such discontinuance or abandonment. Denial of such consent shall not preclude subsequent reapplications whenever the public service company thinks them warranted.
COMAR 20.50.02.03 provides:

Title 20
PUBLIC SERVICE COMMISSION
Subtitle 50 SERVICE SUPPLIED BY ELECTRIC COMPANY

Chapter 02 Engineering

* * * * * *

.03 Adequacy of Supply.
The generating capacity of the utility's plant, supplemented by the electric power regularly available from other sources, shall be sufficiently large to meet all normal demands for service and provide a reasonable reserve for emergencies.

**34.** BGE mounts an additional argument as to why the evidence also supports a finding that special circumstances of the land (as opposed to the structures) of Tracts A, B, and C satisfied the first criterion of BCZR § 307.1. This argument is premised on the locations of existing tree cover on the periphery of the assembled tracts, the cleared areas to the interior, the convergence of the internal lot lines relative to the treed

As to the practical difficulty [35] prong of the criteria for grant of a variance, BGE essentially repeats references to the evidence itemized in this opinion, *supra,* to demonstrate why strict adherence to internal lot line setbacks would harm its ability to meet its general legal mandate and the demonstrated present and future needs of the Ivy Hill service area, and would in fact impair, if not prevent, its ability to screen the needed improvements from views from surrounding properties. Highlighting its reasoning, BGE argues that the

lot lines between the adjoining [BGE] tracts are essentially unimportant except in terms of their legal effect because the purpose of a setback requirement is to protect neighboring property owners from encroachment. Because BGE is its own "neighbor" with respect to these interior lot lines, though, this requirement is irrelevant under the circumstances. Requiring BGE to strictly comply with the setback requirements would not serve the purposes behind the ordinance as BGE does not need to be protected from itself.

Therefore, as Mr. Gavrelis testified, allowing BGE to build across these lot lines, when the practical effect is to maximize the distance to the exterior lot lines, is consistent with the spirit and intent of Section 1A04.3.B.3. As Mr. Gavrelis further testified, the zoning regulations have recognized that public utility companies must be permitted to provide service to their customers, even in rural residential areas.

We are not unmindful of the admonition in many Maryland appellate decisions that variances should be "granted sparing-

---

and cleared areas, and the best siting of the expanded facility in light of those factors.

We shall not analyze this aspect of BGE's argument for at least two reasons: (1) the Board's decision was in no way explained as relying on this evidence; and (2) even were it germane to this appeal, it would fail to carry the day of its own weight because no explanation was given why the characteristics of BGE's land were "peculiar" with regard to other properties in the neighborhood, other than common ownership.

**35.** In light of its conclusion that BGE satisfactorily demonstrated practical difficulty, the Board expressly declined to reach the alternative "unreasonable hardship" criterion.

ly," *cf. Cromwell v. Ward,* 102 Md.App. 691, 703, 651 A.2d 424 (1995), and, when granted and appellate scrutiny sought, affirmances are "exceedingly rare." *Id.* at 708, 651 A.2d 424. The instant case, we believe, is such a "rare" case.

BGE, albeit since 1956 and only on Tract C, has operated a 16.6 megawatt electrical transformer substation, with attendant overhead distribution/supply lines at this location apparently well before any of the homes in the Fox Ridge subdivision were even a gleam in a developer's eye. BGE's business, supplying electrical power, is a State regulated franchise. The need for its product and the growth of that need are not "self-inflicted" or exclusively within BGE's control. If one concludes (as the Board did) for the sake of this particular argument that the size of the expansion of the Ivy Hill substation equipment is "needed" (at least within the broad mandate that makes BGE responsible for providing adequate service), that the existing 16.6 megawatt station is inadequate to meet present (let alone future) demand, and that Tract C (or Tracts A or B standing alone) could not accommodate the necessary expansion within the dictates of reasonable engineering and zoning requirements, the reasonableness of acquiring additional land adjacent to Tract C upon which to site the required new substation becomes manifest. These are special circumstances that are peculiar to BGE's assembled properties in the context of this neighborhood and the structures BGE proposes to locate on its property.

We can find nothing in either *Cromwell v. Ward,* 102 Md.App. 691, 651 A.2d 424 (1995) or *North v. St. Mary's County,* 99 Md.App. 502, 638 A.2d 1175 (1994),[36] both heavily

---

**36.** Indeed, *North* is best appreciated when one recognizes the influence exerted by the environmental considerations of the State's Chesapeake Bay Critical Area legislation and regulations over the application of the very strict local ordinance governing the requested variance. *See North,* 99 Md.App. at 513, 638 A.2d 1175. The property owner in *North* wanted to erect a gazebo in a critical area adjacent to a creek so that he could contemplate nature in closer proximity than he was able to from his house. *Id.* at 505–06, 638 A.2d 1175. The fragility of this justification for a variance from the environmentally-driven requirement that no structures be erected within the critical area buffer patently flew in

relied on by the neighbors, that undercuts the Board's decision in the instant case. The Board expressly acknowledged in its decision an awareness of *Cromwell* (involving a building height variance purportedly granted under BCZR § 307.1 for a building that the applicant's contractor had already constructed in violation of the applicable requirement), and then correctly employed, in the proper order, the two-step analysis underscored in *Cromwell. Id.* at 694–95, 651 A.2d 424. We are satisfied that the Board's finding as to the "special circumstances or conditions" existing with regard to the structures that were the subject of the variance application were unique and not shared by other properties or property owners in the area. We are satisfied further that the practical difficulties that BGE would experience if forced to comply strictly with internal lot line setback requirements within its properties, were fairly debatable and consonant with Maryland variance case law.[37,38]

---

the face of Maryland variance case law. The mere desire by a property owner to indulge such a whim, though not inherently unreasonable, could not satisfy either the uniqueness or legitimate hardship requirements so as to override the presumptively prohibited aspect of that request.

**37.** The neighbors reliance on *Cities Service Co. v. Bd. of County Commissioners,* 226 Md. 204, 172 A.2d 523 (1961), is misplaced also. In that case, Cities Service bought three undeveloped, subdivided lots, all with street frontage (but on different streets) at an intersection. *Id.* at 209, 172 A.2d 523. Cities Service desired to erect an automobile service/filling station on the lots and was able to obtain a building permit and pour footings before the county building inspectors issued a stop work order. *Id.* The cause for the stop work order's issuance implicated the building setback requirements. *Id.* at 209–10, 172 A.2d 523. Confusion arose because of the "corner lot" interpretation of the local ordinance's rear line or side line designation of the internal lot lines of the assembled three lots. *Id.* at 211, 172 A.2d 523. In this interpretational morass, Cities Service asserted that its common ownership of the lots should influence the interpretation to ignore essentially the internal lot lines and treat the three lots as a single corner lot. *Id.*

In rejecting Cities Service's argument in this regard, the Court said:
The appellant's contention would, in short, permit private rezoning by the purchaser of the strips of his land adjacent to the property of his neighbors. We think that the implications ... of the Zoning Ordinance are that Lot lines shown on a duly recorded subdivision plat retain their character as front or rear or side lines, as the case

## IV.

Among the findings BCZR § 411.1 required the Board to make in order to grant any public utility use permitted only by special exception is:

Section 411 —PUBLIC UTILITY USES

For public utility uses permitted only by Special Exceptions in addition to the provisions of Section 502, the following regulations shall apply.

---

may be, unless and until either a new plat duly approved by public authority, Parks and Planning, is filed, or until the Ordinance is amended so as to change the definitions of such lines.
*Id.* at 213, 172 A.2d 523.

In the instant appeal, BGE (unlike Cities Service) does not argue that its common ownership of Tracts A, B, and C should have the legal effect of obliterating the internal lot lines. Instead, BGE poured its energies into seeking affirmative relief from the arguable legal effect of the internal lot lines.

Further, in *Cities Service,* the variance applicant appears to have premised its justification for a variance, under whatever the local ordinance requirement was at the time (the relevant text of the ordinance was not reproduced in the opinion), on the hardship it would suffer if its aborted construction were not allowed to proceed. *Id.* at 213–14, 172 A.2d 523. Cities Service's motive for desiring to establish the station was purely a voluntary, mercantile one. *Id.* at 213–14, 172 A.2d 523. In the instant case, BGE's "need" evidence is cloaked in the garment of a general public mandate, presumably implicating retention of its franchise to deliver an essential public service utility. Also, hardship in no way formed a basis for the Board's decision.

Finally, the opinion in *Cities Service,* rather than engaging in an informative or detailed exposition of Maryland variance law, held that, with regard to the denial of Cities Service's variance request based on hardship, the Board of Zoning Appeals for Prince George's County did not deprive Cities Service of its property without due process of law. *Id.* No such constitutional fight has been picked in the case before us now.

**38.·** The neighbors, for the first time on appeal, raise in their reply brief an additional argument that the Board's written decision as to the variance was deficient in setting forth the detailed facts upon which it relied to make the other required findings necessary under BCZR § 307.1. We do not consider that argument as properly before us. *See Fearnow v. C & P Telephone Co.,* 342 Md. 363, 383–84, 676 A.2d 65 (1996); *Ritchie v. Donnelly,* 324 Md. 344, 375, 597 A.2d 432 (1991); *Mayor & City Council v. New Pulaski Co.,* 112 Md.App. 218, 233–34,

411.1 —The use must be needed for the proper rendition of the public utility's service and the location thereof shall not seriously impair the use of neighboring property.

With regard to this required finding, we repeat again what the Board's written decision stated:

The first issue to be decided by this Board, therefore, is the question of need pursuant to Section 411 of the BCZR regarding distribution of electric power. Petitioner brought evidence and testimony by an expert in forecasting electric demand, James F. Ryan. Protestants offered the testimony of Ronald P. Hanley, an employee for a waste collection and recycling company, and one who had three courses in statistics at Pennsylvania State University, and who prepared various graphs which were introduced into evidence. According to the testimony of Charles S. Taylor, an engineer and expert in the area of electric system planning, the BGE franchise with the Public Services Commission in the State of Maryland is required to supply power at all times and satisfy all demands. In short, the obligation of the Petitioner is to serve the demand at peak periods. The Protestants allege that the peak demand experience on one day in the winter of 1994 was, admittedly by the Petitioner's witness, a one-time occurrence; however, that one-time occurrence established the new demand.

It was well-established during the course of evidence and testimony that existing demand, prior to the single-day occurrence in 1994, is not met by the existing substation capacity; therefore, need for enlargement of the substation given current demand is justified. As indicated by Petitioner's experts, future demand is forecasted and is the basis for establishing future demand in designing facilities such as the Ivy Hill Substation. The analysis of the need comparison versus capacity presented by Protestants' witness, Mr. Hanley, points to a future need for increased capacity from this substation. Protestants would have the petitioner in-

684 A.2d 888 (1996); *Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 459–61, 406 A.2d 928 (1979).

crease the capacity of the substation in increments which stay just ahead of demand. The Board notes that such alteration of the substation places unreasonable engineering constraints and unnecessary additional cost to the ultimate development of this site. Such costs would be unnecessarily borne by all electric consumers for the benefit of those in the surrounding community. The Public Services Commission dictates that BGE must provide sufficient power to exceed demand. Petitioner has obviously met its burden of proof to Section 411 as buttressed by the evidence presented by Protestants in their graphic analysis of need versus capacity.

The Protestants further allege that the Ivy Hill Substation should not be used to supply power to areas outside of their own locale. Again, BGE was able to demonstrate that, because of its requirement to provide power, it was forced into the position of switching power distribution away from the Ivy Hill Substation as a result of the peak demands in 1994, creating a similar condition at the nearby Delight Substation in Owings Mills, an area growing even faster than the area surrounding Ivy Hill.

The Board therefore finds as a fact that not only has need been demonstrated but that in further reviewing the requirements of 502.1 the health, safety and welfare of the general public is suspect when required power is not delivered to the homes served by the substations as mandated.

In their brief, the neighbors state they "are not opposed to BGE's need to upgrade their equipment and its capacity appropriately." Ascertaining more precisely where the neighbors contend BGE's proposal crossed the line into inappropriateness, based on the evidence, is somewhat difficult. As we comprehend it, however, that line seems to be the difference between BGE's Phase I expansion (from 16.6 to 32 megawatts) and its Phase II proposal (from 32 to 64 megawatts). We infer this distinction from that portion of the neighbors' brief, introducing the above quoted passage, where it is asserted that under the most generous interpretation of the testimony of BGE's expert electrical needs forecaster, James Ryan, the

existing (using the winter of 1994 peak load on one day of 20.1 megawatts) and projected future demands for service in the existing Ivy Hill substation service area (excluding the Hickory Hill addition) through the year 2015 (multiplying Mr. Ryan's assumed per household fractional megawatt usage by the annual housing growth rates obtained from local government sources) require only 29.9 megawatts of capacity. Hence, the Phase I expansion arguably would accommodate additional development through the year 2018 using similar straight line projections. Even adding Hickory Hill's existing seven hundred or so dwelling units, plus the growth assumption of approximately ten homes per year, the neighbors contend, does not justify approval at this time of Phase II's doubling of the proposed expansion. From this conclusion, they appear to hint at BGE's true motive, which they imagine to be that BGE intends to provide service to undisclosed areas beyond the Ivy Hill and Hickory Hill service areas.

While the neighbors' skepticism is not unfounded totally,[39] the Board was persuaded that 64 megawatts of capacity was "needed for the proper rendition of the public utility's service." Although BGE's evidence justifying approval now of Phase II may have been as thin as workhouse gruel (even supplemented "with an onion twice a week and half a roll on Sundays"),[40] it was nourishing enough to support the Board's decision.[41] The evidence also comports with our understanding of the meaning of "need" in this context.

---

**39.** Indeed, though undoubtedly of scant consolation to the neighbors, were we free to substitute our judgment for that of the Board, we may have been unpersuaded on the same evidence that Phase II was "needed" at this time or at a reasonably ascertainable date.

**40.** *See* Charles Dickens, *Oliver Twist,* chp. II (1837).

**41.** As we understand the conversion table for such matters, ten gossamers of evidence equals a scintilla, and more than a scintilla is required to achieve the critical mass of substantial evidence. *See Turner v. Hammond,* 270 Md. 41, 60, 310 A.2d 543 (1973). The evidence before the Board in support of the need for Phase II approval, in our disciplined appellate judgment, had the probative weight of eleven gossamers.

■ The judicial gloss given to the definition of the "need" requirement in Maryland special exception lore has been that it means "expedient, reasonably convenient and useful to the public." *Neuman v. City of Baltimore*, 251 Md. 92, 99, 246 A.2d 583 (1968) (citations omitted); *accord Lucky Stores v. Board of Appeals*, 270 Md. 513, 527–28, 312 A.2d 758 (1973) (citing *Neuman* ). "Need" does not mean absolute necessity. *Id.* The term is elastic and relative, infusing the designated local government decision-maker with a degree of discretion, not unfettered or to be arbitrarily exercised, in interpreting and applying the facts of each case to this requirement. *Id.*

Without question, BGE adduced substantial evidence to support the Board's approval of the Phase I expansion. The need for that expansion within a relatively near term horizon, whether it be BGE's 2001–2005 or the neighbors' 2015–2018, was properly for the Board, both in mathematical and in legal terms, to sort out as it did.

As to the Phase II expansion, the Board appears to have considered how often it would be reasonable to require BGE to shlep [42] special exception applications back and forth for expansions of this electrical transformer facility. We view it as essentially an administrative judgment call as to the relative maturity or prematurity of the applicant's request. The applicant's implied willingness to commit to the capital expenditures necessary to effectuate its request, if approved, is a factor to be considered. The effect on the rate payers is also a consideration. The ability of a public utility to plan concretely for the future, but to also have the flexibility to respond quickly to unforeseen demands or emergencies, likewise may be, and was, considered in the equation. For the Board to view BGE's evidence as to Phase II, although of much less definiteness than the Phase I evidence, through the prism of BGE's somewhat open-ended legal obligation to

---

**42.** Though more often thought of as a Yiddish term by way of the German "shleppen," "shlep" has been employed in some Maryland jurisdictions, according to your author's knowledge, also as a zoning term of art meaning "to proceed more slowly, tediously, or awkwardly in obtaining zoning approvals."

provide adequate electric service, even under emergency circumstances, was not arbitrary or capricious.[43]

## V.

Based on the evidence before the Board relative to the effect of the BGE proposal on the value of surrounding properties, the Board found, in pertinent part:

Much of the five days of testimony surrounded the requirements of Section 502.1. The first test under 502.1 is that the proposed use for which the special exception is required will not be detrimental to the health, safety or general welfare of the locality involved....

\* \* \* \* \* \*

Pursuant to the issue of general welfare under this subsection, the Protestants allege that property values will be negatively impacted on the expansion of the proposed substation. The Board finds as a fact that the Ivy Hill Substation has existed since 1958; the Board also finds as a fact that all property owners prior to the purchase of their properties were apprised of the ownership of Tract A and the ultimate disposition of that property being with BGE, and that any effect on property values in relation to the existence of the substation were already felt in the purchase of their respective properties. Furthermore, as indicated above, the health, safety and general welfare of other localities served by the Ivy Hill Substation continues to be suspect so long as the substation sits unaltered, as most homes in the area served by the Ivy Hill Substation rely on uninterrupted transmission of electric power as the sole source of energy for the heating of their homes.

---

**43.** Even were the evidence in rebuttal to BGE's evidence properly weighable by us (it was for the Board to do, and it did), Mr. Hanley's adroit regurgitation of and spin on BGE's numbers was nonetheless worthy of the skepticism expressed by the Board. Mr. Hanley had no training or experience in electrical needs forecasting and consequently his extrapolations might not have inspired the same confidence in the Board's minds as did BGE's experts.

As we recounted earlier, the neighbors filed[44] a motion to alter or amend judgment, under Rule 2–534, asking the circuit court either to receive additional evidence and amend/reverse its 24 December 1996 written memorandum and order based thereon or remand the matter to the Board so that the Board impliedly may receive and consider the additional evidence. The additional evidence referred to in the motion and appended to it (together with affidavits of the affected neighbors) consisted of revised real property tax valuations of certain of the neighbors' properties received in late August and September of 1996 from the State Department of Assessments and Taxation (SDAT). The potential relevance of the proffered additional evidence was patent. Each notice included a statement that the valuations had been revised downward from earlier proposed valuations received in December 1995, and were premised in some part on the "proximity to Baltimore Gas and Electric substation." The court denied the motion, without elaboration, by written order of 3 February 1997.

We review the court's action on an abuse of discretion standard. *Blitz v. Beth Isaac,* 115 Md.App. 460, 469 n. 4, 694 A.2d 107, *cert. granted,* 347 Md. 155, 699 A.2d 1169 (1997). Appellate courts define the term "abuse of discretion" in many different ways:

[Abuse of discretion] has been said to occur "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," when the ruling is "clearly against the logic and effect of facts and inferences before

---

**44.** According to the complete docket entries ("case history") included as an appendix to BGE's brief, this motion was not filed (docketed) in the circuit court until 8 January 1997, although it was received apparently by the clerk's office on 3 January 1997. We note that the neighbors' appeal of the court's 24 December 1996 written opinion and order (docketed on 30 December 1996) was received and docketed on 6 January 1997. As the parties make nothing of this sequence, neither shall we.

the court," when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," when the ruling is "violative of fact and logic," or when it constitutes an "untenable judicial act that defies reason and works an injustice."

*North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025 (1994) (citations omitted). This Court has noted that "[t]here is a certain commonality in all of these definitions, to the extent that they express the notion that a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling." *Id.* at 14, 648 A.2d 1025.

We must evaluate the circuit court action " 'from the standpoint of the soundness of the exercise of discretion.' " *Thodos v. Bland,* 75 Md.App. 700, 712, 542 A.2d 1307 (1988) (quoting *Ogburn v. State,* 71 Md.App. 496, 509, 526 A.2d 614 (1987)). This means that

when the consequences of a particular exercise of discretion are clear, i.e., one result is clearly unjust and the other, clearly not, the limits of the exercise of discretion are narrow. On the other hand, when the consequences are not so clear, i.e., no result is clearly just or unjust, the limits of the exercise of discretion are considerably broader. Indeed, in the latter situation, we will not find an abuse of discretion whichever way the trial court may choose to exercise discretion.

*Id.* at 712, 542 A.2d 1307 (citing *Ogburn,* 71 Md.App. at 510, 526 A.2d 614). With this standard of review in mind, we turn to the matter at hand.

Viewing the continuum that was the process of this litigation, we note that, although the affected neighbors received the relevant revised notices of valuation in all but one of the instances on or about 24 August 1996 (the exception being the Follos who received their notice on 27 September 1996), the existence or content of the revised notices was not brought to the court's attention until after the court had filed on 30 December 1996 its written memorandum opinion and

order on the merits. As the neighbors observed in their revisory motion, these revised notices arrived after the circuit court held oral argument on the merits (apparently oral argument took place on 20 July 1995, although that fact is not apparent from the joint record extract filed with this Court).[45] Yet, the neighbors' motion made no effort to explain why the neighbors failed to bring the revised notices to the court's attention in the almost four months that followed their receipt of them prior to the court's ruling on the merits of the case. If the existence of the revised notices was as consequential as the neighbors contended in their motion, a view they renew on appeal, one is left to wonder what occasioned the delay in advancing them? There is no answer to this question that we can find in the joint record extract, nor has one been offered in the neighbors' brief. A lack of diligence could be inferred; perhaps, even a knowing decision to wait and see what the outcome on the merits would otherwise be and to hold the revised notices in reserve as grounds for a possible revisory motion.

Short of bringing such an analytical exercise in inferred blameworthiness to a conclusion, we detect other possible explanations for the court's denial of the motion. The faces of the revised notices explain that they pertain to "Levy Year 96–97," which we interpret to mean the real property tax year commencing 1 July 1996 and ending on 30 June 1997. The December 1995 proposed property valuations that were altered by the August–September 1996 revised notices presumably addressed the same levy year. Even for that levy year, which followed the Board's decision to grant BGE the special

---

**45.** To say that this matter has had a convoluted and tortured history in the circuit court would not be an exaggeration. For example, apparently the record before the Board was not transmitted and filed in the circuit court until 30 December 1996, well after the parties' required legal memoranda had been received on 17 July 1995. The same date the record before the Board was filed, the court's 24 December 1996 opinion and order was filed. Also, there were apparently extensive settlement conferences conducted in this matter (unusual for a zoning case) before the court decided the merits.

exception and variance but overlapped the pendency of this case in the circuit court, the SDAT notices [46] and the hearsay supplementation of those notices by the neighbors' affidavits raised no new issue that had not been advanced before the Board by the neighbors and their expert appraiser, Mr. Kern. To that extent, the proffered additional evidence was cumulative. To the extent that the evidence arguably bolstered the neighbors' contention of adverse effect on surrounding real property values as a result of the proposed substation expansion, the evidence did not render the neighbors' contention irrefutably so as a matter of law, thus removing the matter from the realm of the fairly debatable. The court did not abuse its discretion, therefore, in declining to receive the evidence and change its decision or to remand the case to the Board.

JUDGMENT AFFIRMED; COSTS TO BE PAID ONE-FIFTH (1/5) BY BGE AND FOUR–FIFTHS(4/5) BY FRIENDS OF THE RIDGE, ET AL.

---

**46.** It is unclear from the SDAT materials in the joint record extract whether the State assessors' May and September 1996 site investigations of the neighborhood and the BGE properties attributed the valuation adjustment to the existing 16.6 megawatt substation that had been there since 1956 (or the mobile temporary replacement installed apparently sometime after the original transformer failed in September 1995—a matter not appearing in the extract, but one which BGE's brief informed us of) or the prospect of the expanded facility. The neighbors, however, claimed in their affidavits that the revisions were caused by the latter consideration.