975 A.2d 312

**MONTGOMERY COUNTY, Maryland, et al.**

v.

**Jodi LONGO, et al.**

**No. 1075, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

July 7, 2009.

Karen L. Henry, Rockville and Carol Placek, Kensington, for appellant.

Stephen J. Orens (Rebecca D. Walker, Miles & Stockbridge P.C., on the brief), Rockville, for appellee.

Panel: HOLLANDER, GRAEFF and J. FREDERICK SHARER (Retired, Specially Assigned), JJ.

GRAEFF, Judge.

This appeal arises from a dispute between Carol Ann Placek, appellant and cross-appellee, and appellees and cross-appellants, Jodi Longo and Montgomery County, Maryland. The dispute involves construction pursuant to a building permit, and a revised building permit, issued in 2006 by the Montgomery County Department of Permitting Services ("DPS"). The initial permit, which was issued on August 2, 2006, authorized Ms. Longo to construct an addition to a residential property located at 10234 Parkwood Drive in Kensington, Maryland ("Property"). Ms. Longo sought to expand the footprint of the existing one story residence, add a second story onto the expanded living area, and add an attached garage.

After construction began on the Property, Ms. Placek filed several complaints with DPS regarding alleged permitting violations. In October 2006, DPS issued a stop work order. Ms. Longo filed a revised site plan, which DPS approved, and the stop work order was lifted. In November 2006, DPS issued another stop work order. Ms. Longo submitted a second revised site plan, as well as a revised building permit application. DPS approved the revisions to the site plan, lifted the stop work order, and issued a revised building permit.

On November 9, 2006, Ms. Placek noted an appeal to the Board of Appeals for Montgomery County ("Board"). Ms. Placek appealed the issuance of the revised building permit and the rescission of the stop work orders. Following a hearing, the Board concluded that DPS erred in lifting the stop work orders, and it ordered DPS to reinstate the stop work orders "insofar as they concern the retention of existing exterior walls."

Ms. Longo filed a Petition for Judicial Review in the Circuit Court for Montgomery County. The circuit court reversed the Board's order, concluding that the Board did not have jurisdiction to consider Ms. Placek's appeal because neither the decision to lift a stop work order nor a revision to a building permit is an appealable decision.

Ms. Placek appealed to this Court, and she presents two issues for our review, which we have rephrased slightly:

1. Did the Board of Appeals have jurisdiction to review decisions made by the Department of Permitting Services in issuing a revised building permit and in lifting two stop work orders?

2. Does the record before the Board of Appeals contain substantial evidence to support the Board's finding that DPS erred in lifting the stop work orders?

The County also noted an appeal from the circuit court's order, and it raises essentially the same issues for our review. With respect to the first issue, however, although the County contends, as did Ms. Placek, that the Board of Appeals had jurisdiction to hear the appeal from the decision of DPS to lift the stop work orders, it does not agree with Ms. Placek that the issuance of a revised building permit was an appealable event.

Ms. Longo filed a cross-appeal, presenting two issues for our review, which we have rephrased slightly:

3. Did the Board err in finding that Ms. Placek has standing to appeal?

4. Did the County lose its right to appeal to this Court based on the inconsistent positions it has taken before the Board and before this Court?

For the reasons set forth below, we shall reverse the judgment of the circuit court and remand the case to that court to affirm the decision of the Board of Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2006, Ms. Longo, as a managing member of 10234 Parkwood Drive, LLC, acquired the Property, a single family home. On June 9, 2006, Ms. Longo filed an application for a residential building permit with DPS, requesting permission to build a two story addition to the Property.

DPS has developed a "Code Interpretation/Policy" ("the Policy") to "establish definitions for the terms 'alteration', 'addition', and 'new construction' when applied to existing single-family dwellings." The definitions provided are as follows:

A. ALTERATION—a modification to a building which does not change the footprint or floor area of an existing building.

B. ADDITION—a modification to an existing building which changes the footprint or floor area provided that:

- The construction must not, at time of application, exceed the existing footprint, by more than 100%.

- At least 50% of the existing first floor exterior walls, in their entirety, (measured in linear feet) and comprising the footprint of the existing building and must remain as exterior walls. The determination of first floor exterior walls is that it must have its finished floor surface entirely above grade.

- Any increase in building height is subject to current zoning standards and may occur provided that the construction is within the above criteria.

C. NEW CONSTRUCTION—any change to an existing building which exceeds the definition of an alteration or addition as stated above.

Thus, to qualify as an addition, and as relevant here, construction to a home had to meet two requirements. First, the construction could not exceed the existing footprint by more than 100% ("100% Footprint Rule"). Second, at least 50% of the existing first floor exterior walls had to remain exterior walls ("50% Wall Retention Rule").

The plans Ms. Longo submitted with her building permit application stated that the footprint of the existing house was 956 square feet and the footprint of the addition would add an additional 955 square feet to the footprint of the house. The plans showed that there would be additions to the back of the house, but that the front and side walls would remain. On August 2, 2006, the County issued Ms. Longo a permit to add a second story addition to the Property.[1]

On October 9, 2006, Ms. Placek called DPS to report alleged permit violations. DPS records indicate that Ms. Placek made the following complaint:

Construction—started not following the rules by displaying their buidling [sic] permit. There is a port-a-potty out in the street and she believes that [a permit is required]. The addition is really over 100% of the footprint of the home. It should be considered as a NEW home. There should be at least two walls left standing in order to allow it to be allowed as an addition and one of the second walls has been down [ ] partially and you can see the studs. They are rebuilding it. The caller wants to be contacted asap on the outcome of this complain[t]. //Keep caller information anonymous.

On October 11, 2006, Mark Nauman, an inspector with the Montgomery County Building Construction Division, inspected the Property. He issued a stop work order and a notice of violation, concluding that the "existing footprint has at least been doubled in size and the existing structural exterior walls have been demolished more than 50% not allowing them to be utilized as the intact exterior walls of the finished project." Mr. Nauman subsequently informed Ms. Longo that she should apply for a new house permit.

---

1. According to the attorney for the County who appeared before the Board, if Ms. Longo applied for a permit for new construction, she would be required to participate in an additional level of zoning review with the Montgomery County Department of Park and Planning. There might be additional requirements imposed, including installation of a sprinkler system, but the record is not clear on this point.

Instead of applying for a new house permit, Ms. Longo submitted a revised site plan, which indicated: "GARAGE DOOR ELIMINATED TO MAINTAIN 50% EXTERIOR WALL POLICY." On October 13, 2006, after consulting with the County Attorney regarding the 50% Wall Retention Rule, DPS lifted the stop work order and voided the notice of violation.[2]

On November 2, 2006, DPS issued a second stop work order based on calculations performed by Ms. Placek, which indicated that the addition is "too large to be an addition." Susan Scala–Demby, Zoning Manager for DPS, sent an email to Ms. Placek stating:

> We reviewed the calculations you did on the size of the addition and it is indeed too large to be an addition. We will place a stop work order on the property today and we will direct the builder to file for a new construction permit. The addition permit will be revoked.

On November 6, 2006, Ms. Longo filed a revision to her initial building permit application and a second revised site plan. The revised site plan reduced the size of the garage from 22 feet by 11 feet to 21.8 feet by 10.7 feet. On November 6, 2006, DPS issued a revised building permit. The revised building permit included the following notation:

> two story addition—1st 1444/2nd 1696—"Revision to permit 10/12/06" Removing garage door and making it into a carport. * * * * * * * *DO NOT ISSUE WITHOUT TALKING TO SUSAN SCALA–DEMBY FIRST* * * * * * * * * Revision submitted for structural/to meet 100% code on 11/6/06* * revising front wall of garage 11 sqft

The stop work order was lifted.

On November 9, 2006, Ms. Placek filed an appeal to the Board of Appeals from "revision of residential building permit

---

**2.** Throughout this opinion, we refer to the different attorneys representing Montgomery County as the "County Attorney," recognizing that, in most instances, the attorney is an Assistant County Attorney.

for an addition and rescission of stop work order placed as a result of violating conditions for a permit for an addition." Ms. Placek stated that the reason for her appeal was "damage to [her] property and dangerous precedent [sic] set for future decisions regarding what may be allowed under a permit for an 'addition.' "

On January 16, 2007, Ms. Longo, 10234 Parkwood Drive, LLC, and the County filed a Joint Motion for Summary Disposition, arguing that (1) the revision of a building permit was not an appealable event, (2) Ms. Placek did not have standing to bring the appeal, and (3) the building permit was properly issued to Ms. Longo.

On February 8, 2007, Ms. Placek filed an opposition motion. She argued that the Joint Motion for Summary Disposition should be denied because (1) there were material facts in dispute; (2) she had standing to bring the appeal; (3) the lifting of a stop work order and the issuance of a revised permit are appealable orders; and (4) DPS improperly issued Ms. Longo a permit for an addition instead of for new construction.

A hearing was held on February 28, 2007, and the Board denied the Joint Motion for Summary Disposition.[3] The Board concluded that Ms. Placek had standing to bring this appeal because she lived six houses away from the Property and her house would be affected by runoff from the development of the Property.

The Board also concluded that the DPS decision to lift the stop work order and the permit revision were appealable orders. It reasoned as follows:

In the instant case, unlike *Hawk*,[4] the Board finds that the permit violations that gave rise to the issuance of the stop

---

3. The transcripts from this preliminary hearing were not included in the record. The Board's written order on this preliminary motion, however, was included in its final opinion issued at the resolution of the case.

4. *Nat'l Inst. of Health Fed. Credit Union v. Hawk,* 47 Md.App. 189, 422 A.2d 55 (1980), *cert. denied,* 289 Md. 738 (1981).

work orders, and led to the subsequent permit revisions (if the facts are viewed in the light most favorable to the Appellant), go straight to the heart of DPS' determination that this construction was in fact an addition and not new construction. These permit revisions arguably impacted the continuing validity of the original building permit, and the Board finds that it is this interim change in facts that differentiates this case from *Hawk*.

The Board further concluded that there were genuine disputes of fact, and, therefore, it denied the motion for summary disposition.

A three day hearing before the Board of Appeals commenced on March 14, 2007, and continued on May 2, 2007, and on June 6, 2007. Susan Scala–Demby, Zoning Manager for DPS, testified that DPS issued a permit to Ms. Longo on August 2, 2006, for construction of a two story addition to the Property. She testified that Ms. Longo's building application and site plans were reviewed under the DPS "addition policy," and the changes reflected in the site plans were authorized under the policy.

DPS reviewed the site plans for compliance with the 50% Wall Retention Rule. The plans indicated that the front wall and the left wall were being retained. Although acknowledging that removal of a door and the chimney from the front wall left a large gap, Ms. Scala–Demby stated that these changes constituted an "[a]lteration of the wall," not removal of the wall. She explained that "[t]hey were making a modification. They were taking out the chimney and fireplace and modifying that wall. Just the same way as you cut out a doorway or you enlarge windows." She explained:

If the wall was 16 feet, we wanted 16 feet of wall left. You could however alter that wall. You could put in new windows. You could put in a door. Because if you're doing an addition that comprises a good portion of your house, the typical applicant wants to have all the same windows around the house.... So we allow them to make changes to that

front wall or to any wall that remains as long as they do not tear down all of that wall.

Ms. Scala–Demby testified that the front, left, and right wall all could be considered to meet the 50% Wall Retention Rule.

Ms. Longo testified that she is a member of 10234 Parkwood Drive, LLC, which acquired the Property in June 2006. That same month, Ms. Longo applied for the building permit to build a second story addition on the Property. She testified that the first stop work order "had to do with the retention of walls and whether or not there was sufficient retention of the exterior walls." According to Ms. Longo, the blueprints "disclosed clearly" the changes to the front wall, which included removing the chimney. After the stop work order was issued, Ms. Longo and her husband met with staff from DPS. In that meeting, the County Attorney advised that "there would be absolutely no question about exterior walls if we removed the garage door." Mr. Bell, from DPS, advised Ms. Longo "as to what language [she] could put on the revision when [she] came back." Ms. Longo testified that, following this meeting, she submitted a "voluntary" revision to her building permit application as a "super precaution," which included a note that "GARAGE DOOR ELIMINATED TO MAINTAIN 50% EXTERIOR WALL POLICY." She testified that, after DPS approved the revised building permit, it lifted the stop work order.

With respect to the second stop work order, Ms. Longo testified that "complaints coming in from [Ms. Placek] led to an inspector coming out to the property." She testified that "the issues at hand from the second inspection, I believe, were that studs had been removed and that we were over in terms of the square footage allowed for an addition." Ms. Longo indicated that the inspector did not find a zoning violation, but, "to be even more cautious," she submitted another revision to the building permit to "shrink the size of the garage" by nine square feet.

On November 6, 2006, DPS approved the site plan, and it noted next to its approval: "Revision To Decrease Size of

Addition To 100% Or Less of Existing Footprint." DPS lifted the stop work order.

Lynn Gallagher, Ms. Longo's architect, testified as an expert witness in architecture. Ms. Gallagher testified that she designed the architectural plans for the Property. To comply with the 50% Wall Retention Rule, Ms. Gallagher designed the plans to retain the front wall and the left wall. She testified that she "could have" considered the right wall as an "exterior wall" for purposes of this rule, but she "didn't need to go beyond there" because she "already had 50 percent" based on the front and left wall. Ms. Gallagher testified that the front wall should count towards the 50% Wall Retention Rule:

> The wall itself, a wall in the plane in that plane is still there. It's always been there. You're allowed to change window openings. You're allowed to change door openings. Historically, this is nothing that's a surprise to the permitting people because it's shown very clearly as a difference from the existing to the proposed. There's no doubt in anybody's mind that we were going to change window openings, and we were going to change door openings. That's been the polic[y] all along. That you are allowed changes, even though they might include changing headers. They include changing materials.

* * *

> I believe the first floor exterior wall does remain. The permitting department, zoning, have all verified that, and said that it met their criteria. And I've been doing it for a very long time, and it's not cropped up before as a problem.

In reaching this conclusion, Ms. Gallagher emphasized that the Policy does not mention anything about the structural system of a wall.

Mark Nauman, an Inspector III with Montgomery County's Department of Permitting Services, Division of Building Construction, testified that he worked in Complaints Investiga-

tions.[5] Mr. Nauman investigated a complaint for the Property and issued a stop work order:

> When I arrived at the house I, my observations were that more than 50 percent of the existing exterior walls had been demolished, and it appeared that the footprint of the existing house had at least doubled. So my actions were to post a stop work order and issued [sic] a notice of violation which I did.

Mr. Nauman did not take any measurements, but instead, he "paced it off" to determine that "the footprint of the new stuff exceeded the existing structure by at least 100 percent."

With respect to the condition of the exterior walls, Mr. Nauman testified:

> My observations were that that front wall structure had been demolished to the point where a new wall had to be built behind it to support the second floor structure. . . . The right wall of the house was now enclosed behind a garage and a habitable space above the garage, which helped in my determination that more than 50 percent of the exterior walls were now in a demolished state and unable to be used as exterior walls in the finished product.

He continued:

> I had determined as can be observed by the photographs here that a substantial portion of the front wall had been removed, and according to the wording of the regulation, the wall was supposed to remain in tact [sic] and be utilized in its entirety as a finished exterior wall. And obviously, that was not able to take place because of the overall extent of the demolition of the wall. It had been a structural wall. It was no longer capable of being a structural wall, and it would require substantial rebuilding.

---

5. Mr. Nauman testified that, although the Policy is a zoning policy and "[t]ypically a zoning issue would be handled through the zoning department," zoning and the Building Construction Division "cross paths" "in areas where it comes to building construction itself."

Mr. Nauman also observed that "[a] new studded wall was built behind the original structural masonry wall to support the second floor and roof load above it," which extended "the full length of the front wall of the existing house." Mr. Nauman did not review the building plans before investigating the complaint, but he explained: "I always err in [sic] the side of caution and post a stop work order and issue a notice of violation and place the burden upon the builder to prove otherwise."

After Mr. Nauman issued the stop work order, he received a phone call from Ms. Longo and advised her that "the remedy for this would be to apply for a new house permit and that the current permit would be voided, as revisions are not granted for this kind of a situation." Mr. Nauman informed Mr. Bell and Ms. Scala–Demby about the situation because, as an employee who works in the Building Construction Division, this issue "was falling under a zoning ordinance" and they were the individuals who would make a final determination about what would happen. Mr. Nauman learned two days later that "the situation had been rectified through Bobby Bell," and his "stop work order had been lifted, and notice of violation was voided."

Bobby Bell, a Permitting Specialist II with Montgomery County's Department of Permitting Services, testified that he conducted the zoning plan review for the Property. Following Mr. Nauman's issuance of a stop work order and a notice of violation, Mr. Bell met with the County Attorney, and they concluded that the construction on the Property did not violate the 50% Wall Retention Rule:

We discussed the condition of the wall that was left, talking about the front wall. And we also discussed the right wall, the garage structure. But it really boiled down to focusing on the front wall, and it was decided then that the front wall was fine, it was within policy.

* * *

I think it was kind of a mutual agreement [between Mr. Bell and the County's attorney] that it was in compliance. We

require you to maintain the wall in its entirety, it's linear length. It doesn't preclude you from going in and enlarging windows, relocating doors, that kind of thing as long as that wall remains at it's [sic] linear length. It does not preclude you from putting a load bearing wall or studding behind it to support the second story. That wall still, in our opinion, has remained in tact [sic] and it still counted towards the 50 percent.

Mr. Bell did not believe that the stop work order was lifted with a written order.

Pete Hrycak, an Inspector with the County's Department of Permitting Services, testified that he inspects and investigates "land use complaints" and "development standards." Pursuant to a request from his supervisor, Mr. Hrycak posted a stop work order at the Property, which he believed was "in relation to the two remaining walls issue." Other than posting the stop work order, he had "very limited involvement" with the Property.

At the end of the hearing, Ms. Placek advised the Board that she "was going to testify regarding standing." In response, the Board Chair stated: "I believe we ruled on that. We would not have proceeded had we not found standing. And I think since you are the next door neighbor, it's clear that you have an interest." [6]

Ms. Placek, Ms. Longo, and the County presented closing arguments. The County supported DPS' decision to lift the stop work and requested that the Board deny Ms. Placek's appeal.

At the conclusion of the hearing, the Board issued an oral opinion, concluding that Ms. Longo did not violate the 100% Footprint Rule:

I think [the County's attorney] said it clearly that it may be close, but you've got to draw the line somewhere. And one thing that has been consistent throughout, and I would

---

6. In its written opinion, the Board stated that Ms. Placek lives six houses or 250 feet away from the Property.

actually add my own back of the envelope calculation to that, we have calculations about the existing footprint that all land within 947 square feet. Exhibit 23, Mr. Bell's calculation of the revised plan[,] showed it at 946.92 square feet.

When I add that calculation, I came up to 947.2 square feet, so in all cases we're looking at a difference of 300ths of a square foot. And so even though it has been close, consistently the calculation of the footprint of the addition has been, by whatever small amount, smaller than the calculation for the footprint of the existing house.

And so for that reason, I would find, although it is extremely close, and frankly, if the laugh test were the test, I would have a lot of questions. However, the bright line as to the 100 percent requirement and the number of calculations we've had, all of which are verifiable through examination of the plans, show that the footprint of the addition is, in fact, smaller than the footprint of the house. And I just want to clarify and sort of summarize the testimony.

The Board concluded, however, that DPS erred in lifting the stop work order because Ms. Longo failed to retain 50% of the existing first floor exterior walls on the Property. The Board stated:

[T]here can be no question given a plain reading of [the Policy] that the front wall does not count as an existing wall remaining in its entirety. And because we had very clear testimony from Ms. Scala–Demby that with regard to a given length of wall, all of it is in or all of it is out.

In this case, all of the front wall would be out in terms of counting towards the 50 percent. So what you're left with are the two side walls which are 25 foot 10 in length, and when you add that up, you have 51 foot 8 inches of lineal wall remaining, and with 125 lineal feet total of the original exterior walls, you wound up with 41 percent of the walls remaining and that doesn't meet the 50 percent test.

So for that reason, I would recommend that we grant the appeal and I would commend DPS for the very thorough

review that they did on being alerted to the possibility that there was a problem. However, it is clear from the lack of consistent testimony about how this 50 percent standard is applied that it would be a stretch for the Board to surmise that there is a consistent practice at DPS as far as interpreting [the Policy], which leaves us with interpreting the clear language or the plain language, I should say, of the regulation which requires that at least 50 percent of the existing first floor exterior walls in their entirety, which was clearly, and I think the structural integrity measure is important there, but not necessarily dispositive, measured in linear feet and comprising the footprint of the existing building and must remain as exterior walls. I think, in fact, that's a pretty clear standard and applying that standard, it is also clear that the front wall, none of it remains as an exterior wall.

On October 30, 2007, the Board of Appeals issued a written opinion setting forth its factual findings and conclusions of law. The Board made the following factual findings:

1. The Property, known as 10234 Parkwood Drive in Kensington, is an R–60 zoned parcel identified as Lot 18, Block 4 in the Parkwood subdivision. The size of the Property is approximately 8,803 square feet.

2. On June 9, 2006, Intervenor Jodi Longo applied to DPS for a building permit to construct a two-story addition at the subject Property. Building Permit No. 423918 was issued on August 2, 2006, for the requested addition.

3. On October 9, 2006, the Appellant called DPS to complain about several aspects of the construction at the subject Property, alleging that the Intervenors had not properly displayed their building permit, that there was a port-a-porty on site which required permits, and that Intervenors needed to apply for a new construction permit (1) because it appeared that the addition was more than 100 percent larger than the footprint of the existing structure, and (2) because one of the two walls which needed to be maintained if the construction were to be permitted as an addition had come down and had visible studs. The Proper-

ty was inspected on October 11, 2006 by DPS inspector Mark Nauman. Mr. Nauman issued a stop work order/notice of violation for non-compliance with the spirit of the zon[ing] code, noting that it appeared that the existing footprint had at least been doubled in size and that the existing structural exterior walls had been demolished more than 50 percent, not allowing them to be utilized as the intact exterior walls of the finished project. On October 13, 2006, the case was closed after the permit holder reached agreement with DPS' zoning office and complied with permit revisions. See Exhibit 6, page 4.

A second stop work order/notice of violation was issued November 2, 2006, following a complaint concerning the studs in the front wall and the overall square footage of the addition. This stop work order was lifted by DPS on November 6, 2006. See Exhibit 11 at page 6.

4. Building Permit No. 423918 was revised on October 12, 2006, to reflect the removal of the garage door and conversion of the proposed garage into a carport. This permit was again revised on November 6, 2006, as follows: "Revision submitted for structural/to meet 100% code on 11/6/06 * * revising front wall of garage 11 sq ft." See Exhibit 16(c).

5. The Appellant filed this appeal to the Board of Appeals on November 9, 2006, asserting that the stop work orders should not have been lifted, the October 12, 2006, and November 6, 2006, revisions to the Building Permit should not have been accepted, and that DPS should require the permit applicant (Intervenors) to reapply for a building permit as a new house and meet all associated requirements.

The Board concluded that the renovations to the Property did not comply with the 50% Wall Retention Rule:

[The Policy] also requires that "[a]t least 50 percent of the existing exterior first floor walls, in their entirety, (measured in linear feet) and comprising the footprint of the existing building" must remain as exterior walls. The

Board finds, as evidenced by consistent testimony from DPS zoning officials, that the wall on the right side of the house, between the garage and the first floor living space, is an exterior wall, should be treated as remaining in its entirety, and should be counted towards the 50 percent requirement in [the Policy]. Indeed, Ms. Scala–Demby testified that the right side wall of the house was considered exterior, despite the garage/carport, because it separated the conditioned living space of the house from the unconditioned space of the garage. She went on to explain that "exterior wall" in this sense means an exterior wall of the finished first floor of the house.

Similarly, the Board finds that unchallenged and consistent testimony and evidence of record indicates that the exterior wall on the left hand side of the house is remaining in its entirety, and should be counted towards the 50 percent requirement. In addition, the Board finds that the plans show and testimony indicates that the rear wall of the original house was incorporated as an interior wall of the renovated house, and could not be counted toward the 50 percent requirement. Given that the plans show that the front and rear walls of the existing, rectangular house were longer than the side walls, and given testimony which indicated that walls are counted in their entirety (they're either all in, or they're all out), the Board concludes that in order [to] meet the 50 percent wall retention requirement of [the Policy], the front wall would need to be found to remain in its entirety. See Exhibit 16(b) at page 8.

Despite language which refers to existing walls remaining "in their entirety" in linear feet for purposes of [the Policy's] 50 percent requirement, DPS officials consistently testified that their interpretation of [the Policy] allows changes to the openings in the wall for windows and doors, and the Board accepts this as the policy of DPS. The Board finds that the record contains numerous photographs which show that the changes made to the front wall of the subject Property went beyond changing windows and doors, to the removal of large portions of this front wall in their

[sic] entirety. See Exhibit 18(a) at pages 34–36, and at page 38; Exhibits 19(a)-(c), and (e). Indeed, the Board finds that these pictures show that the original front wall, between the window on the left hand side of the house (as you face it from the road) and the front door, was completely removed. See Exhibit 19(b).

(Footnote omitted).

The Board went on to note that it was not apparent from the plans Ms. Longo submitted the extent of the planned demolition of the front wall.

In reviewing the plans of record, the Board finds that the extent of this demolition was not clearly shown on and was not apparent from the constructions plans submitted with the original application, nor was it apparent from the plan revisions dated 10/12/06 or 11/05/06. Similarly, the Board finds that none of the plans on file clearly show the extent of existing front wall that is to remain, or that which will be newly constructed/rebuilt. See Exhibits 22, 24 and 30. Furthermore, the Board finds that a comparison of the plans for the existing house with the construction plans submitted does not reveal the full extent of the contemplated demolition. The Board finds that this lack of clarity in the plans could have caused a DPS official reviewing the plans to reasonably believe that incremental changes were being made to the window and door openings, and that the firebox was being demolished and filled in, and thus to conclude that the wall was being maintained as an exterior wall for the purposes of [the Policy]. See Exhibits 21, 22, 24, and 30. The Board finds that the extent of actual demolition to the front wall of the house (and the resultant extent of front wall remaining) was not apparent from any of the plans, and indeed was not apparent until the physical demolition took place on site. At that point, stop work orders were issued which called into question the extent of front wall retention for the purposes of compliance with [the Policy]. The Board finds that, as shown by the photographs in the record, the demolition that occurred on site involved the removal of entire sections of wall—not just the changing

of windows and doors. As a result ... of this demolition—demolition which again was not obvious from any of the plans filed with this permit—the Board finds that the front wall can no longer be counted as remaining in its entirety for purposes of the 50 percent wall retention requirement of [the Policy]. Given the necessity that the front wall be counted as remaining if this construction were to be considered to meet the 50 percent wall retention requirement, as discussed above, the Board concludes that the stop work orders should not have been lifted.

The Board is not persuaded by testimony from the Intervenor's architect and DPS that the plans showed the changes made to the front wall, nor are they persuaded by DPS testimony that those changes should be considered an alteration of the wall, and thus that the wall should be considered to remain in its entirety and counted towards the 50 percent requirement. As noted above, the Board concludes, after reviewing the plans and plans revisions, that the extent of proposed demolition was not clear, that the actual demolition exceeded that allowed under [the Policy], and consequently that the stop work orders should not have been lifted. The burden in this case was on DPS to show that the stop work orders were correctly lifted.

\* \* \*

The Board in this case is not persuaded that the stop work orders were correctly lifted.

(Footnotes omitted).

On November 29, 2007, Ms. Longo filed a Petition for Judicial Review in the circuit court, arguing, among other things, that the lifting of a stop work order and the revision of a building permit are not appealable decisions. Ms. Placek filed an "Answering Memorandum" in opposition to Ms. Longo's memorandum. The County also filed an "Answering Memorandum," but, instead of supporting the decision reached by DPS in approving Ms. Longo's building permit, as it argued before the Board of Appeals, the County argued

before the circuit court that "the record supports the Board's findings and conclusions . . . ."

On May 29, 2008, a hearing was held in the circuit court. On June 10, 2008, the circuit court reversed the decision of the Board of Appeals, concluding that "the Board lacked jurisdiction to hear the appeal, because the lifting of stop work order and revisions to the permit are not appealable decisions under [MCC] 8–23." The court stated:

> Section 8–23 of the Code states: "(a) Any person aggrieved by the issuance, denial, renewal, or revocation of a permit **or any other decision or order of the Department under this Chapter** may appeal to the County Board of Appeal within 30 days after the permit is issued, denied, renewed, or revoked, or the order or decision is issued."

With respect to the lifting of a stop work order, the court found:

> While the *issuance* of a stop work order is an order under Chapter 8 and therefore appealable, a *lifting* of a stop work order is not, because it is not set forth in Chapter 8. While DPS may have the authority (although not proscribed by statute) to lift a stop work order, it is not a decision under this Chapter tha[t] can be appealed. Therefore, the Board did not have jurisdiction to hear Ms. Placek's appeal with respect to this issue under Section 8–23.

The court similarly found that a revision to a building permit did not constitute "any other decision or order" that could be appealed.

> Similarly, the revisions to the building permit is [sic] not an appealable decision under Section 8–23. The Court finds that the Board erred in denying the Petitioners' Motion for Summary Disposition. In *National Institutes of Health Federal Credit Union v. Hawk,* an agency issued a use and occupancy permit. No appeal was filed within 30 days thereafter. Approximately six months later, a resident sent a letter to the agency requesting that the permit be revoked. The agency responded with a letter denying that request. The resident appealed even though the limitations

period expired. The Court of Special Appeals found that an agency's written denial to revoke an original use and occupancy permit was not an appealable "decision." The jurisdiction of the County Board over the original permit was not revived by the agency's refusal to revoke the permit. It was, at most, a re-affirmation of the issuance of the original permit. Therefore, the *Hawk* court concluded that the Board lacked jurisdiction to hear the matter and it should have been dismissed.

Although the facts in *Hawk* do not exactly mirror the facts in this case, the appeal provisions in the County Code and Zoning Ordinance dealing with administrative proceedings in *Hawk* are similar to the appeal provisions under Code 8–23. The *Hawk* court states that the appeal provisions "clearly relate in their respective procedure to a point in time when the finality of the review process is conceded and all opportunities to appeal from administrative decisions and orders are clearly specified within prescribed procedures and time limitations." It can hardly be said that revising a building permit constitutes a point in time when the finality of the review process is established. Revisions to permits can occur frequently. In fact, in the case *sub judice*, there were two revisions to the building permit. If revisions to permits were appealable decisions, then the limitations period to appeal could constantly be revived upon multiple permit revisions.

The *Hawk* court further explains that "[t]he specific remedy for an alleged improper issuance of a use and occupancy certificate ... is the filing of an appeal with the County Board within thirty days after the certificate has been issued." Thus, Ms. Placek should have filed her appeal within 30 days of the issuance of the original permit, which was on August 2, 2006, and not after any subsequent revisions. The Board lacked jurisdiction to hear this matter. Because this matter was resolved on jurisdictional grounds, the Court does not address the remaining issues on appeal.

For the reasons set forth herein, the Board's decision shall be REVERSED.

(Footnotes omitted).

Ms. Placek and the County noted timely appeals.

## DISCUSSION

## I.

## Standard of Review

On appeal from a decision of an administrative agency, we review the final decision of the agency, rather than the decision of the circuit court. *See People's Counsel for Balt. County v. Loyola College in Md.*, 406 Md. 54, 66, 956 A.2d 166 (2008). Our role is limited to determining "whether there is substantial evidence in the agency record as a whole to support the agency's factual findings and conclusions and whether the agency's decision is based upon an erroneous conclusion of law." *Singley v. County Comm'rs of Frederick County*, 178 Md.App. 658, 674–75, 943 A.2d 636, *cert. denied*, 406 Md. 114, 956 A.2d 202 (2008). A reviewing court "may not substitute its judgment for the administrative agency's in matters where purely discretionary decisions are involved, particularly when the matter in dispute involves areas within that agency's particular realm of expertise, so long as the agency's determination is based on 'substantial evidence.' " *People's Counsel for Balt. County v. Surina*, 400 Md. 662, 681, 929 A.2d 899 (2007) (citation omitted). The substantial evidence test "requires us to affirm an agency decision, if, after reviewing the evidence in a light most favorable to the agency, we find 'a reasoning mind reasonably could have reached the factual conclusion the agency reached.' " *Montgomery County v. Rotwein*, 169 Md.App. 716, 727, 906 A.2d 959 (2006) (quoting *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512, 390 A.2d 1119 (1978)).

With respect to legal conclusions, " '[g]enerally, a decision of an administrative agency, including a local zoning board, is owed no deference when its conclusions are based

upon an error of law.'" *Layton v. Howard County Bd. of Appeals*, 399 Md. 36, 49, 922 A.2d 576 (2007) (quoting *Alviani v. Dixon*, 365 Md. 95, 109, 775 A.2d 1234 (2001)). "Nevertheless, 'a degree of deference should often be accorded' the legal conclusions of an administrative agency regarding statutes, ordinances, or regulations that the agency is tasked with administering." *Trinity Assembly of God of Balt. City, Inc. v. People's Counsel for Balt. County*, 407 Md. 53, 78, 962 A.2d 404 (2008) (quoting *Surina*, 400 Md. at 682, 929 A.2d 899).

## II.

### Appealability

The first issue we must address is whether the Board had jurisdiction to hear this case, *i.e.*, whether an appeal was properly before the Board. "[T]he right of appeal is wholly statutory." *Hikmat v. Howard County*, 148 Md. App. 502, 515, 813 A.2d 306 (2002). "[W]here a specific remedy and procedure for appeal are provided by statute, they must scrupulously be followed." *Hawk*, 47 Md.App. at 196, 422 A.2d 55.

Maryland Code (1957, 2005 Repl. Vol.), Art. 25A, § 5(U) grants Charter counties, such as Montgomery County, the following authority:

> To enact local laws providing (1) for the establishment of a county board of appeals whose members shall be appointed by the county council ...; and (4) for the decision by the board on petition by any interested person ... of the following matters arising (either originally or on review of the action of an administrative officer or agency) ...; **the issuance, renewal, denial, revocation, suspension, annulment, or modification of any license, permit, approval, exemption, waiver, certificate, registration, or other form of permission or of any adjudicatory order**....

(Emphasis added).

The right to appeal actions taken by DPS is set out in § 8–23 of the Montgomery County Code (2002) ("MCC"). Section

8–23(a) confers jurisdiction on the Board to hear appeals from decisions or orders issued by DPS under Chapter 8 of the MCC:

> Any person aggrieved by the issuance, denial, renewal, or revocation of a permit **or any other decision or order** of the Department [of Permitting Services] **under this Chapter** may appeal to the County Board of Appeals within 30 days after the permit is issued, denied, renewed, or revoked, or the order or decision is issued.

(Emphasis added).

Here, the initial building permit was issued on August 2, 2006. No appeal was taken within 30 days after issuance of the permit. After construction began, however, Ms. Placek complained to DPS regarding permit violations. Ms. Placek alleged, among other things, that the building, as constructed, did not retain two walls as required for an addition. DPS investigated the complaint, initially determined that it potentially had merit, and issued a stop work order.[7] After discussions with Ms. Longo, discussions with the County Attorney, and the submission of a revised site plan, DPS lifted the stop work order.

Ms. Placek argues that the decision of DPS to lift the stop work order is an appealable decision or order under MCC § 8–23(a). She additionally argues that the subsequent decision by DPS to issue a revised building permit was an appealable event under § 8–23(a). She contends that, because an appeal was noted within 30 days of these events, the circuit court erred in holding that the Board did not have jurisdiction to entertain her appeal. The County, although not agreeing that the revisions to the building permit constituted an appealable event, agrees with Ms. Placek that the Board had "juris-

---

**7.** MCC § 8–20(a) authorizes DPS to issue stop work orders "whenever the director determines that work on a building or structure is being prosecuted in violation of the provisions of this chapter ... including those conditions upon which the permit has been issued or in a manner which threatens the safety, health and welfare of the public...."

diction to review the decisions made by DPS to lift the stop work orders in this case." [8]

Ms. Longo, on the other hand, contends that the circuit court properly found that the Board of Appeals did not have jurisdiction to consider Ms. Placek's appeal. She argues that, in order to challenge the permit, Ms. Placek was obligated to file an appeal within 30 days after DPS issued the initial building permit, which Ms. Placek did not do. Ms. Longo argues that neither the revisions to the building permit nor the lifting of the stop work order constituted a "decision or order" from which an appeal could be noted.

■■■ The caselaw on this issue is sparse. We begin our analysis by discussing *Nat'l Inst. of Health Fed. Credit Union v. Hawk*, 47 Md.App. 189, 422 A.2d 55 (1980), *cert. denied*, 289 Md. 738 (1981), the sole case relied upon by the circuit court in its finding that the Board did not have jurisdiction to hear Ms. Placek's appeal. In *Hawk*, a use and occupancy permit was issued on November 18, 1977. *Id.* at 192, 422 A.2d 55. No timely appeal was taken from that action. *Id.* After the time to appeal the issuance of the permit expired, several area residents wrote letters to the County requesting that the County suspend the use and occupancy permit and schedule a show cause hearing to "determine the validity" of the permit. *Id.* at 195, 422 A.2d 55. On July 27, 1978, the Director of the Department of Environmental Protection sent a letter denying the requests. *Id.* at 193, 195, 422 A.2d 55. This denial was appealed several days later. *Id.* at 193, 422 A.2d 55.

This Court concluded that the Board did not have jurisdiction to consider the appeal:

The County Board should not have heard these appeals and should not have addressed the Director's issuance of a

8. As indicated, two stop work orders were issued and subsequently lifted. The first stop work order addressed the 50% Wall Retention Rule. The October 13, 2006, decision to lift this stop work order is the decision at issue in this appeal. The second stop work order addressed the size of the new construction, an issue that is not contested on appeal.

permit on November 18, 1977, because the thirty-day time limit set forth in Section 2–112(a)(3) of the Montgomery County Code had already passed before the appeals were filed on August 9 and August 10, 1978. The appellees failed to comply with the procedure for timely appeal, and thus lost their privilege to challenge the initial permit.

*Id.* at 195, 422 A.2d 55.

This Court quoted with approval the hearing examiner's conclusion that the letter from the Director was "not a final administrative decision, order or determination," but was "at most a reiteration or reaffirmation of the final administrative decision or order" granting the original permit. *Id.*

> If this were not the case an inequitable, if not chaotic, condition would exist. All that an appellant would be required to do to preserve a continuing right of appeal would be to maintain a continuing stream of correspondence, dialogue, and requests of the nature pursued by the appellants herein with appropriate departmental authorities even on the most minute issues of contention with the ability to pursue a myriad of appeals ad infinitum.

*Id.* This Court held that "an administrative decision concerning reconsideration of zoning is not an appealable final order." *Id.* at 196, 422 A.2d 55. Thus, the Court held, the County Board did not have jurisdiction to hear the case. *Id.* at 197, 422 A.2d 55.

Similarly, in *United Parcel Serv. v. People's Counsel,* 336 Md. 569, 573, 650 A.2d 226 (1994), after a building permit was issued, and after commencement of construction, a citizen wrote a letter to the Director of the Office of Planning and Zoning lodging an objection to the manner in which the building would be used. The zoning commissioner responded with a letter explaining that the proposed use, warehousing, was a permitted use without a special exception. *Id.* The Court of Appeals stated that the January 1987 letter "did not grant, deny, decide, or order anything." *Id.* at 585, 650 A.2d 226. Rather, the letter "simply explained and defended the 1986 decision approving the application for a building permit."

Accordingly, the Court held that the letter was not an " 'approval' or 'decision' appealable to the Board of Appeals." *Id.*

We find *Hawk* and *United Parcel Service* to be distinguishable from the present case. Here, the lifting of the stop work order was not merely a reaffirmation of the prior issuance of a building permit. Rather, as the Board found, it was a "decision" by DPS based on new factual information presented and submission of a revised building permit application.

Ms. Placek's complaint to DPS was not with respect to the initial building permit. It was a complaint that the building, as it was being constructed, did not meet the requirements to qualify as an addition. Mr. Nauman, who investigated the complaint, agreed that, based on the extent to which the front wall had been demolished, the construction to the house did not qualify as an addition. He issued a stop work order and told Ms. Longo that the current permit would be voided, and she would need to apply for a new house permit. He then informed Mr. Bell and Ms. Scala–Demby about the situation because they would make the final determination about what would happen.

In determining whether to lift the stop work order, DPS was not merely reconsidering whether its initial decision to issue the building permit was correct. Rather, it was assessing whether the building, as constructed, met the requirements for an addition. The Board of Appeals made a factual finding that the extent of the demolition to the front wall was not clearly shown on the construction plans submitted by Ms. Longo to DPS. Thus, when DPS received a complaint that the building, as constructed, did not meet the requirements for an addition, and after an investigation resulted in a preliminary determination that there was some validity to the complaint, DPS had to make a decision whether the extent of the actual demolition to the front wall, to a greater extent than shown on the construction plans, satisfied the 50% Wall Retention Rule. These new facts were significant enough that Mr. Bell, a Permitting Specialist II with DPS, met with the County

Attorney to discuss the issue. At that meeting, "it was then decided that the front wall was fine, it was within policy."

Thus, DPS's decision to lift the stop work order was not "a reiteration or reaffirmation" of its initial decision to issue the permit, as in *Hawk*, 47 Md.App. at 195, 422 A.2d 55. Rather, it was a decision made in response to new facts, i.e., demolition to the front wall that was not depicted clearly in the plans that DPS relied upon in issuing the permit. After meeting with the County Attorney, DPS determined that the building, as constructed, met the criteria for an addition. Accordingly, the County made the decision that the permit issued would not be voided, the stop work order would be lifted, and construction would be allowed to proceed. Under these circumstances, we hold that the decision to lift the stop work order was an appealable decision or order pursuant to § 8–23(a).[9]

Accordingly, the circuit court erred in concluding that the Board did not have jurisdiction to consider Ms. Placek's appeal. Therefore, we will proceed to address the other preliminary procedural issues raised by Ms. Longo, and then we will address the Board's decision on the merits.

## II.

### The County's Participation in this Appeal

Ms. Longo points out that the Office of the County Attorney for Montgomery County, acting on behalf of DPS, argued before the Board that the Board had no jurisdiction to consider Ms. Placek's appeal. This, of course, is the opposite of

---

9. Because we find that the lifting of the stop work order was an appealable decision in this case, giving the Board jurisdiction to hear the case, we need not address whether the issuance of a revised building permit is an appealable decision or order. We note that, in *Mendelson v. Dist. of Columbia Bd. of Zoning Adjustment*, 645 A.2d 1090, 1093–94 (D.C.1994), the District of Columbia Court of Appeals held that the issuance of a revised building permit was an appealable "decision," at least with respect to the revisions approved. Here, the revisions to the plans in the revised building permit do not relate to the extent of demolition of the front wall, the issue that is presented on appeal.

what the County is arguing in this Court. Ms. Longo argues that the County "may not switch sides" and that the County Attorney may not advocate "on appeal a position exactly opposite to the position it advocated in the administrative proceeding." Ms. Longo argues that the County has "lost the right to appeal the decision of the Circuit Court which in effect upheld the position of the Department of Permitting Services, the same position advocated by the Office of the County Attorney in the administrative hearing."

The County does not dispute that, acting on behalf of DPS, it took a different position before the Board than it is taking on appeal. It argues, however, that its position in the case "is consistent with its responsibility as legal advisor to the various components of County government and as the exclusive entity responsible for representing the County's interests in all legal actions." It contends that the County "may participate in a matter on judicial review when the interests of the government support the participation."

We recognize that, because the Office of the County Attorney represents all departments of the County, it is inevitable that situations may arise wherein different attorneys, advising different departments and agencies, may take inconsistent positions. Although we are inclined to agree with the County that this does not preclude the County from participating in a case on appeal, it is not necessary for us to decide this issue in this case. "It is a settled principle of Maryland law that 'where there exists a party having standing to bring an action ... we shall not ordinarily inquire as to whether another party on the same side also has standing.' " *See Friends of the Ridge v. Balt. Gas & Elec. Co.*, 120 Md.App. 444, 469 n. 27, 707 A.2d 866 (1998) (quoting *Sugarloaf Citizens' Ass'n v. Dep't of the Env't*, 344 Md. 271, 297, 686 A.2d 605 (1996)), *vacated in part on other grounds*, 352 Md. 645, 724 A.2d 34 (1999). Here, Montgomery County is not the only appellant in this case. Ms. Placek, who, as discussed *infra*, is an aggrieved party with standing to bring an appeal, has also appealed the judgment of the circuit court. Ms. Placek raises the same issues as the County. Thus, it is not necessary to resolve the

question whether Montgomery County is precluded from advancing the arguments it makes on appeal; we will address the issues as raised by Ms. Placek, regardless of the resolution of that issue.

## III.

### Ms. Placek's Standing to Appeal

██ Ms. Longo next argues that the Board erred in finding that Ms. Placek had standing to appeal the decision of DPS. Specifically, she argues that "Appellant Placek had no discernable interest" in the Property "that was in any way different from that of any member of the general public who might see the structure on the subject Property or who might walk by it," and, therefore, Ms. Placek was not aggrieved by the permit revision or the rescission of the stop work order. Ms. Placek counters that the Board correctly found that she had standing, and "[Ms. Longo] has ignored the Board's stated basis for finding" standing as well as the "multiple reasons presented in the record." We agree with Ms. Placek, and we hold that Ms. Placek has standing to bring this appeal.

██ Section 8–23 provides that "[a]ny person aggrieved . . . may appeal to the County Board of Appeals. . . ." Generally, a person is deemed to be aggrieved if he or she "can demonstrate that the land use decision will adversely affect his, her, or its interest, and that such interest is personal or specific, and not shared by the general public." *120 W. Fayette St., LLLP v. Mayor of Balt.*, 407 Md. 253, 271, 964 A.2d 662 (2009). With respect to the location of two properties, "[a]n adjoining, confronting or nearby property owner is deemed, *prima facie,* to be specially damaged and, therefore, a person aggrieved." *Bryniarski v. Montgomery County Bd. of Appeals*, 247 Md. 137, 145, 230 A.2d 289 (1967). *Accord Chatham Corp. v. Beltram*, 252 Md. 578, 584, 251 A.2d 1 (1969) (no clear error in finding that owners of homes in close proximity to the reclassified area had standing to sue); *Comm. for Responsible Dev. on 25th St. v. Mayor & City Council of Balt.*, 137 Md.App. 60, 86, 767 A.2d 906 (2001)

("Generally, to be considered an aggrieved party, the complaining property owner must be in 'sight or sound' range of the property that is the subject of his complaint.").

 In contrast, "[a] person whose property is far removed from the subject property ordinarily will not be considered a person aggrieved." *Bryniarski*, 247 Md. at 145, 230 A.2d 289. *Accord White v. Major Realty, Inc.*, 251 Md. 63, 64, 246 A.2d 249 (1968) (party who lived ½ mile from property that was being rezoned was not aggrieved); *Shore Acres Improv. Ass'n v. Anne Arundel County Bd. of Appeals*, 251 Md. 310, 313, 318, 247 A.2d 402 (1968) (owner of land 3,760 "feet in a straight line from the nearest point of Baldwin's property" and approximately 9,400 "feet by road from the nearest point of Baldwin's land" was not aggrieved in manner different than public).

Here, the Board concluded that Ms. Placek was "aggrieved and had standing to pursue this appeal, based on where she lives." The Board explained its reasoning as follows:

She states that she lives six houses, or approximately 250 feet, from the subject Property, that she walks and drives by it every day, and that she sees the back of it from Rock Creek Park bike trail.... Appellant states that contrary to the assertions of the Intervenor and County, she does live within sight or sound of the subject Property, since she can see the back of the subject house from her family room windows, decks and back yard, due to the extent of the projection of the new construction toward the rear of the Property. Appellant further states that the new construction will add to impermeable surface area, and cause additional runoff to flow from the higher elevation of the subject Property down the street to the storm drain in front of her house, which she states is located at the lowest point directly downhill from the subject Property. In addition she states that a storm drain channel runs parallel to her house, and that part of her house is in a flood plain which will be affected by the runoff from the development of the subject Property.

The Board's conclusion that Ms. Placek had standing to appeal was based on her status as a nearby property owner and the impact to her home from the runoff of the Property. We find no error.

## IV.

### The Board's Decision on the Merits

We turn next to the issue whether there was substantial evidence to support the Board's decision that the house, as constructed, did not qualify as an addition and that DPS erred in lifting the stop work order. As indicated, we do not substitute our judgment for the expertise of the agency or second-guess the agency's decision where there is substantial evidence to support the agency's decision. *See Surina,* 400 Md. at 681, 929 A.2d 899.

The Board's decision that the construction exceeded that permitted as an addition was based on the 50% Wall Retention Rule. This rule authorizes changes to an existing building as an addition, provided that "[a]t least 50% of the existing first floor exterior walls, in their entirety, (measured in linear feet) and comprising the footprint of the existing building [ ] must remain as exterior walls." On this issue, the Board found as follows:

Despite language which refers to existing walls remaining "in their entirety" in linear feet for purposes of [the Policy's] 50 percent requirement, DPS officials consistently testified that their interpretation of [the Policy] allows changes to the openings in the wall for windows and doors, and the Board accepts this as the policy of DPS. The Board finds that the record contains numerous photographs which show that the changes made to the front wall of the subject Property went beyond changing windows and doors, to the removal of large portions of this front wall in their [sic] entirety. See Exhibit 18(a) at pages 34–36, and at page 38; Exhibits 19(a)-(c), and (e). Indeed, the Board finds that these pictures show that the original front wall, between the window on the left hand side of the house (as you face it

from the road) and the front door, was completely removed. See Exhibit 19(b).... As a result of the extent of this demolition—demolition which again was not obvious from any of the plans filed with this permit—the Board finds that the front wall can no longer be counted as remaining in its entirety for purposes of the 50 percent wall retention requirement of [the Policy]. Given the necessity that the front wall be counted as remaining if this construction were to be considered to meet the 50 percent wall retention requirement, as discussed above, the Board concludes that the stop work orders should not have been lifted.

Ms. Longo argues that the Board erred in concluding that the front wall did not count towards the 50% Wall Retention Rule. She contends that the purpose of the policy is "to require that the length of an exterior wall must remain," and the front wall, although altered, met that requirement. She argues that the Board sought to "infuse into" the policy a requirement of "structural 'adequacy,'" but there is no such requirement.

Ms. Placek counters that the Board's decision should be affirmed because the "plain language of the 50 percent exterior wall requirement strongly states that the wall must remain 'in its entirety' and the Board could have concluded based on its review of the photographs that it did not." Similarly, the County argues that, "[n]ot only did the record contain substantial evidence to support the Board's decision, but the Board properly applied the DPS interpretation policy."

Here, the Board concluded that, once the chimney was removed from the front wall of the house, the wall did not remain in its entirety, and, therefore, the construction violated the 50% Wall Retention requirement for an addition. Mr. Nauman's testimony supported this finding. Mr. Nauman testified that, at the time he inspected the Property, the wall did not remain in its entirety:

[A] substantial portion of the front wall had been removed, and according to the wording of the regulation, the wall was supposed to remain in tact [sic] and be utilized in its

entirety as a finished exterior wall. And obviously, that was not able to take place because of the overall extent of the demolition of the wall. It had been a structural wall. It was no longer capable of being a structural wall, and it would require substantial rebuilding.

Photographs were introduced into evidence, which documented the state of the wall at the time of Mr. Nauman's inspection, and which supported the Board's finding.

Based on this evidence, and the deference afforded to the Board in such matters, we conclude that there was substantial evidence to support the Board's finding that the front wall did not remain "in its entirety" when "entire sections of [the] wall" were removed. Accordingly, we reverse the judgment of the circuit court, and we remand the case to that court to affirm the decision of the Board of Appeals.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE DECISION OF THE BOARD OF APPEALS FOR MONTGOMERY COUNTY. COSTS TO BE PAID BY APPELLEE.**